# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| ROBERT L. REESE, Derivatively on Behalf of Nominal Defendant AMERICAN ELECTRIC POWER COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> NICHOLAS K. AKINS, BRIAN X. TIERNEY, THOMAS E. HOAGLIN, DAVID J. ANDERSON, J. BARNIE BEASLEY, JR., RALPH D. CROSBY, JR., ART A. GARCIA, LINDA A. GOODSPEED, SANDRA BEACH LIN, MARGARET M. MCCARTHY, RICHARD C. NOTEBAERT, LIONEL L. NOWELL III, STEPHEN S. RASMUSSEN, OLIVER G. RICHARD, III, and SARA MARTINEZ TUCKER, <br><br> Defendants, <br><br> and <br><br> AMERICAN ELECTRIC POWER COMPANY, INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Robert L. Reese ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, American Electric Power Company, Inc. ("AEP" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, insider trading, and contribution for Violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by AEP

with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    AEP is an electric public utility holding company that generates, transmits, and distributes electricity.  Approximately 30% of its customers are in Ohio, and approximately 30% of the energy AEP generates in Ohio stems from two coal-fired plants that the Company owns through a consortium with other utility companies.

2.    In July 2019, Ohio passed a bill that would provide a $1.3 billion ratepayer-funded bailout of these two plants. Throughout the period in which the bill was crafted and considered by the Ohio legislature, AEP maintained that it supported the purpose and efforts and that it evaluated the bill's impact on the Company, when, in fact, AEP's executives orchestrated the bill's passage by funding the campaign for Ohio House Speaker, Larry Householder, in return for the bailout for the Company's plants.

3.    On July 21, 2020, a criminal complaint and supporting affidavit were unsealed, revealing that utility companies had bribed the Householder with more than $60 million to secure the passage of the bailout and had concealed the payments through 501(c)(4) organizations called Generation Now and Energy Pass-Through. The utility companies were not named in the complaint, but corroborating information in the public record indicates that FirstEnergy Corp. and AEP made the improper payments.  Once the bill had passed, these entities also undermined efforts to add a referendum on the ballot to repeal the bill, which was widely unpopular among Ohio ratepayers. Since then, Householder, his associates, and Generation Now have pled guilty to racketeering charges and admitted that Generation Now was formed for the express purpose of receiving undisclosed donations "in return for specific official action by Householder relating to

the passage and preservation of legislation that would go into effect and save the operation of two nuclear plants in Ohio."

4. On July 26, 2020, *Columbus Dispatch* published an article revealing that AEP had contributed $350,000 toward the bribery scheme and that the funds had been directed through Empowering Ohio's Economy, Inc., a non-profit operated solely with AEP funds, and Coalition for Opportunity & Growth.

5. On this news, the Company's share price fell $4.67 per share, or over 5%, to close at $81.16 per share on July 27, 2020, on unusually heavy trading volume.

6. On December 2, 2020, *Dayton Daily News* reported that AEP had contributed $900,000 to the groups at the center of the scandal, including $550,000 in 2019 alone.

7. These revelations precipitated the filing of a securities class action in the United States District Court for the Southern District of Ohio against AEP and certain of the defendants named herein, captioned *Nickerson v. American Electric Power Company, Inc., et al.*, Case No. 2:20-cv-04243-SDM-EPD (the "Securities Class Action").

8. On August 25, 2020, Plaintiff served on AEP a demand pursuant to N.Y. B.C.L. § 624 (the "Demand") seeking to inspect Board documents related to director oversight and/or knowledge of the political contributions. Following negotiations and entry into a confidentiality agreement, the Company produced approximately 540 pages of internal documents. Due to the information produced in response to the Demand and in the public record, Plaintiff did not make a demand on AEP's Board prior to filing suit because make a demand would be a futile and useless act.

9. At least half of the Company's current Board could not disinterestedly and independently respond to a litigation demand in connection with the misleading representations

because, among other things, at least eight of the fourteen current directors knew or should have known of AEP's contributions to EOE, which was within AEP's control. Thus they knew or should have known of the Company's connection to the bribery scandal. As a result, a majority of the Board could not disinterestedly investigate whether their conduct constituted breaches of fiduciary duties under Delaware law.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: contribution for violations of Section 10(b) of the Exchange Act.

11. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(l) because complete diversity exists between plaintiffs and each defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

12. The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III. PARTIES

**Plaintiff**

14. Plaintiff Robert L. Reese owns 900 shares of AEP stock and has continuously owned AEP stock since 2009. Plaintiff is a citizen of Pennsylvania.

4

**Nominal Defendant**

15.     Nominal Defendant AEP is a New York corporation with its principal executive offices located at 1 Riverside Plaza, Columbus, Ohio 43215. The Company's common stock trades on the NASDAQ exchange under the symbol "AEP."

**Defendants**

16.     Defendant Nicholas K. Akins ("Akins") has served as Chief Executive Officer ("CEO") of the Company since November 2011, President since January 2011, Chairman of the Board since January 2014, and a director since October 2011. He has also served as Chairman and CEO of all of AEP's major subsidiaries. He is Chair of the Executive Committee and a member of the Policy Committee. Akins is a citizen of Ohio.

17.     Defendant Brian X. Tierney ("Tierney") has served as Chief Financial Officer ("CFO") of the Company since October 2009. Tierney is a citizen of Ohio.

18.     Defendant Thomas E. Hoaglin ("Hoaglin") has served as AEP's Lead Director since April 2012 and as a director since 2008. He is Chair of the Directors and Corporate Governance Committee ("Governance Committee") and a member of the Audit, Policy, and Executive Committees. Hoaglin is a citizen of Ohio.

19.     Defendant David J. Anderson ("Anderson") has served as a director of the Company since 2011. He is Chair of the Audit Committee and a member of the Executive, Finance, and Policy Committees. Anderson is a citizen of Massachusetts.

20.     Defendant J. Barnie Beasley, Jr. ("Beasley") has served as a director of the Company since 2014. He is Chair of the Nuclear Oversight Committee and a member of the Human Resources and Policy Committees. Beasley is a citizen of Georgia.

21. Defendant Ralph D. Crosby, Jr. ("Crosby") has served as a director of the Company since 2006. He is Chair of the Human Resources Committee and a member of the Executive, Nuclear Oversight, and Policy Committees. Crosby is a citizen of Virginia.

22. Defendant Art A. Garcia ("Garcia") has served as a director of the Company since 2019. He is Chair of the Finance Committee and a member of the Audit, Governance, and Policy Committees. Garcia is a citizen of Florida.

23. Defendant Linda A. Goodspeed ("Goodspeed") has served as a director of the Company since 2005. She is a member of the Audit, Policy, and Nuclear Oversight Committees. Goodspeed is a citizen of Florida.

24. Defendant Sandra Beach Lin ("Lin") has served as a director of the Company since 2012. She is a member of the Audit, Governance, and Policy Committees. Lin is a citizen of Texas.

25. Defendant Margaret M. McCarthy ("McCarthy") has served as a director of the Company since 2019. She is a member of the Audit, Policy, and Nuclear Oversight Committees. is a citizen of Massachusetts.

26. Defendant Richard C. Notebaert ("Notebaert") has served as a director of the Company since 2011. He is a member of the Governance, Policy, Finance, and Human Resources Committees. Notebaert is a citizen of Florida.

27. Defendant Lionel L. Nowell III ("Nowell") has served as a director of the Company since 2004. He is a member of the Governance, Policy, and Finance Committees. Nowell is a citizen of Florida.

28. Defendant Stephen S. Rasmussen ("Rasmussen") has served as a director of the Company since 2012. He is a member of the Governance, Policy, Finance, and Human Resources Committees. Rasmussen is a citizen of Iowa.

29. Defendant Oliver G. Richard, III ("Richard") has served as a director of the Company since 2013. He is Chair of the Policy Committee and a member of the Human Resources and Nuclear Oversight Committees. Richard is a citizen of Louisiana.

30. Defendant Sara Martinez Tucker ("Tucker") has served as a director of the Company since 2009. She is a member of the Governance, Policy, and Human Resources Committees. Tucker is a citizen of Texas.

31. Defendants Akins, Tierney, Hoaglin, Anderson, Beasley, Crosby, Garcia, Goodspeed, Lin, McCarthy, Notebaert, Nowell, Rasmussen, Richard, and Tucker are sometimes referred to hereinafter as the "Individual Defendants."

**Relevant Non-Party**

32. Daryl Roberts ("Roberts") has served as a director of the Company since December 2020.

## IV. DUTIES OF THE INDIVIDUAL DEFENDANTS

### A. Fiduciary Duties

33. By reason of their positions as officers, directors, and/or fiduciaries of AEP and because of their ability to control the business and corporate affairs of AEP, at all relevant times, the Individual Defendants owed AEP and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage AEP in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of AEP and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the

7

6674812

Company owes to AEP and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34. The Individual Defendants, because of their positions of control and authority as directors and/or officers of AEP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with AEP, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

35. To discharge their duties, the officers and directors of AEP were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of AEP were required to, among other things:

    (a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    (b)    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    (c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

    (d)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.**     **Governance Committee Charter**

36.     The Governance Committee is responsible for, among other things, developing a set of corporate governance principles applicable to AEP and "[o]therwise taking a leadership role in shaping the corporate governance of the corporation."

37.     The committee's charter provides certain "functions [which] shall be the common recurring activities of the Committee in carrying out its responsibilities."   In relevant part, the charter lists the following:

C.     <u>Corporate Governance</u>

*        *        *

4. Oversee on a continuing basis the implementation of the AEP Corporate Compliance Program, including reporting by the chief compliance officer, the development of specific programs of legal compliance in various important areas of concern to the operation of AEP System companies, and the designation of successor chief compliance officers.

*        *        *

6. Oversee the Company's Sustainability Report, ***including the portion of the report that relates to the Company's political contributions***

**C.**     **Audit Committee Charter**

38.     The Audit Committee is responsible for the "[t]he quality and integrity of the Company's financial statements" and "[t]he company's process for identifying and managing major risks, including strategic, operational, and financial risks."

39.     The Audit Committee's charter also lists  "functions [which] shall be the common recurring activities of the Committee in carrying out its responsibilities."  In particular, the Audit Committee must "[o]versee the process of identifying major enterprise risks, including strategic, operational, and financial risks, and assure that all such risks are communicated to the Board for assignment of oversight among the Board and its Committees."

6674812

**D.** **Policy Committee Charter**

40.     The Policy Committee is "responsible for examining the Company's policies on major public issues affecting the Company and its subsidiaries, including environmental, industry change and other matters, as well as established policies that affect the relationship of the Committee and its subsidiaries to their service areas and the general public." The committee's charter further provides that members should "[c]ounsel the Chief Executive Officer and other members of management on any policy matters presented to the Committee for its consideration and study."

**V.     SUBSTANTIVE ALLEGATIONS**

**A.     Background**

**1.     AEP's Operations**

41.     AEP is an electric utility holding company that generates, transmits, and distributes electricity. Its subsidiary, Ohio Power Co. ("OPCo"), is registered as AEP Ohio and transmits and distributes electricity to nearly 1.5 million retail customers in Ohio, which is roughly 30% of the Company's total customers.

42.     Approximately 30% of the energy AEP generates in Ohio comes from two coal-fired plants, Kyger Creek (in Cheshire, Ohio) and Clifty Creek (in Madison, Indiana). The plants are owned by Ohio Valley Electric Corporation ("OVEC"), a consortium of utility companies including AEP and FirstEnergy Corp. According to the Inter-Company Power Agreement ("ICPA"), the sponsoring companies are entitled to receive and are obligated to pay for all OVEC capacity in proportion to their power participation ratio. AEP owns 43.47% of OVEC, the largest stake among the owners.

43.     Coal-fired plants are subject to strict environment compliance requirements from the U.S. Environmental Protection Agency ("EPA"), North American Reliability Corporation

("NERC"), and state public utility laws, among others. Adhering to these requirements is costly. For example, defendant Akins noted in July 2019 that AEP has "invested nearly $9 billion in capital since 2000 to drastically cut emissions from our coal-fueled power plants."

44. Moreover, OVEC coal plants have been selling electricity for less than the cost to generate since 2012. As a result, and due to the compliance requirements, OVEC had approximately $1.3 billion of debt and only $3 million in net income for fiscal 2019.

### 2. The Passage of HB6 and The Related Criminal Convictions

45. In July 2019, Ohio passed House Bill 6 ("HB6"), which provided a $1.3 billion ratepayer-funded bailout to the power plants owned by OVEC. HB 6 enacted a monthly fee ($0.85 for residential customers and $2,400 for major industrial plants) to send to the failing power plants. The bill also removed incentives for solar and wind projects and eliminated programs that helped residents use less power through energy-saving appliances or upgraded systems.

46. HB6 was widely unpopular. A campaign was launched to add a referendum on the bill in the 2020 election to remove it.

47. On July 21, 2020, a criminal complaint and supporting affidavit were unsealed, detailing an elaborate bribery scheme in which certain utility companies paid $60 million to Ohio House Speaker Larry Householder ("Householder"), which was funneled through 501(c)(4) organizations called "Generation Now" and "Energy Pass-Through." Householder secretly controlled Generation Now and used these funds to pay his campaign staff and the campaigns of 21 other state candidates in the 2018 primary and general elections. Once he became House Speaker, Householder secured the passage of HB 6 in return for the utility companies.

48. Ohioans for Energy Security, another group supported by the payments, financed advertisements to undermine the referendum efforts, including ones warning Ohioans that the Chinese would take over the state's energy grid if the bailout was repealed. Generation Now also

hired top signature collection firms to thwart the repeal efforts and prevent them from gathering the signatures necessary to put the proposed referendum on the ballot.

49.     Householder's associates, Jeff Longstreth and Juan Cespedes, have pled guilty to violations of Racketeer Influenced and Corrupt Organizations ("RICO") Conspiracy and face up to 20 years in prison and fines up to $250,000.  As part of the plea agreement, Longstreth admitted to participating in the organization and management of Generation Now "as a mechanism to receive undisclosed donations to benefit HOUSEHOLDER and to advance HOUSEHOLDER's efforts to become Speaker of the Ohio House of Representatives."  And in a separate statement of facts, Cespedes admitted to his participation in a larger conspiracy to obtain Generation Now donations "in return for specific official action by Householder relating to the passage and preservation of legislation that would go into effect and save the operation of two nuclear plants in Ohio" and to block the ballot campaign to overturn the $1 billion bailout for the plants in HB6.

50.     On January 29, 2021, Generation Now pled guilty to one count of racketeering for its role, agreeing to a term of not more than 5 years' probation, fines up to $250,000, fees, and the forfeiture of bank accounts with balances exceeding $1.5 million.  Generation Now admitted that it was created for the express purpose "to be used as a mechanism to receive undisclosed donations to benefit HOUSEHOLDER and to advance HOUSEHOLDER's efforts to become Speaker of the Ohio House of Representatives."  *See* Plea Agreement, *United States v. Generation Now*, No. 1:20-CR-00077-TSB (S.D. Ohio Feb. 5, 2021).  In return for the funds, the companies would benefit from "specific official action [regarding] legislation that would go into effect and save the operation of two nuclear power plants in Ohio."  *Id.*

**B.      The Individual Defendants Knew of AEP's Involvement in the Householder Criminal Enterprise**

51.      Between 2017 and 2019, AEP donated $900,000 through its non-profit, Empowering Ohio's Economy ("EOE"), to Generation Now and Coalition for Growth & Opportunity, which are directly linked to Householder and his associates.  AEP was the sole contributor to EOE.  As alleged herein, EOE was used as a smoke screen for the Company to divert funds to finance the passage of HB6 while concealing AEP's involvement in the bribery scheme.

**1.      AEP's Executives Worked Directly With Householder's Enterprise to Shape HB6**

52.      HB6 was a priority for AEP.  Not only did the bill generate about $50 million annually to subsidize the two coal-fired plants, it would also avoid repeating the financial calamity from 2016 when AEP was forced to record a $2.3 billion impairment charge because of "a decreasing likelihood of cost recovery through regulatory proceedings or legislation in the state of Ohio."  According to an email exchange between AEP's in-house counsel and a consultant for Householder's policy advisor, "avoid[ing] any impairment for the Company [was] a critical component" of HB6:

> This proposal creates a regulatory asset – to be recovered as a distribution expense through subsequent rate cases only if the clean air fund does not fully reimburse the Company. So there is no new nonbypassable charge and no immediate rate impact (beyond eliminating our current bypassable AER charge). ***This approach avoids any impairment for the Company – which is a critical component for the Company as we discussed last week*** . . . .

53.      Several AEP executives were closely involved in the passage of HB6.  Tom Froehle ("Froehle"), the Vice President of External Affairs of AEP and AEP's top lobbyist, served as a director of EOE and thus knew of the use of funds that AEP had contributed to the non-profit. Froehle simultaneously advocated for AEP's interests in the passage of HB6.  For example, he sent an email to the Ohio House of Representatives on May 22, 2019 stating that "American

13

Electric Power – Ohio supports House Bill 6" and that "[t]his bill will allow AEP Ohio to make investments that our customers have been asking us to provide." He signed the letter in his capacity as VP of External Affairs for AEP.

54. Froehle also testified in support of HB6 on behalf of AEP. On June 12, 2019, he testified before Ohio's Energy and Public Utilities Committee during its second hearing on HB6, stating:

> House Bill 6 addresses Ohio's increasing reliance on out-of-state generation. ***This bill addresses legacy generation issues that have been plaguing the state for nearly a decade. It will allow AEP Ohio to make investments in renewables that our customers have been asking us to provide.*** Specifically investments that help drive economic development in the state. As a result, this legislation will keep and bring jobs to the state of Ohio.
>
> AEP is focused on bringing more renewable energy resources into our generation mix throughout our 11 state territory for the last several years. Furthermore, all sectors of AEP Ohio customers are increasingly seeking renewable energy sources for their electricity supply. Some large commercial customers have also expressed a desire for renewable power from AEP Ohio. Having these resources readily available helps make Ohio a more attractive place for these companies to locate and expand their operations.
>
> HB 6 would allow AEP Ohio to offer renewable energy services to our customers and pose no financial risk to other customers – this is an economic development tool that AEP Ohio has been seeking clarity on for several years.
>
> ***As it relates to Ohio Valley Electric Corporation (OVEC), HB 6 provides ongoing certainty for an important and longstanding baseload generating asset. The bill also includes rates caps for customers while allowing for the continued operation of OVEC generating units, which will provide certainty for AEP Ohio's customers and Ohio jobs.***
>
> Finally, this legislation would allow Ohio's electric utilities to offer voluntary energy efficiency plans similar to those operated by the state's natural gas utilities, a model we believe can be successful. House Bill 6 in its current form allows for AEP Ohio to finish implementation of currently-approved plans and phase out the programs.
>
> AEP Ohio believes this legislation puts Ohio on the path of a balanced energy policy that provides benefits to all customers in this state.

55.     AEP worked directly with Householder and his associates to craft HB6 to the Company's benefit.  For example, on May 9, 2019, AEP's in-house counsel Steven T. Nourse, Denny Larr of Larr Policy Consulting sent an email confirming that their discussions about the bill's provisions were funneled to Householder and his Senior Policy Advisor, Pat Tully:

> While we are very grateful and appreciative of everyone working to reach a consensus position, the bottom line is ***this language is now in Pat Tully's hands and it will be up to him and Speaker Householder to make the final determination as to how they would like to address this matter.*** Perhaps we should just let them look at the language and make their decision. After all, ultimately that is the final authority at this time.

56.     Moreover, on June 24, 2019 – *i.e.*, one month before HB6 was signed into law – AEP's Director of Government Affairs, Maria L. Haberman, sent proposed amendments for HB6 to Pat Tully.  The following amendments were ultimately incorporated into the final bill that was signed into law and sought to "ensure continuous OVEC cost recovery through 2030" for AEP:

**D. Clarifying amendments for continuous OVEC net impact recovery through 2030**

***(1) Amend definition of "'prudently incurred costs related to a national security generation resource" in section 4928.0l(A)(42) of the Revised Code as follows:***

• In line 1259 after the word "former", insert the following language: "sponsor under such power agreement or"

*     *     *

***(3) Amend new section 4928.148 of the Revised Code as follows:***

• In line 1386, insert the following after the comma: "including recovery of any deferrals that exist at that time,"

**2.     The Board Knew of the Company's Substantial Contributions to Generation Now**

57.     The Board reviewed and discussed the Company's political contributions, thus the directors knew, or had reason to know, of the contributions to Generation Now, including through EOE:

6674812

(a) ████████████████████████████████
████████████████████████████████ ████████
███████████████ ██████████████████████████
████████████████████████████████
████████████████████ █████████████████████
████████████████████████████████
████████████████

(b) ████████████████████████████████
████████████████████████████████
████████████████████ ███████████████████
████████████████████████████████

(c) ████████████████████████████████
████████████████████████████████ ████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████

(d) ████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
██████████████████████████████

16

58. The Board had reason to know of the contributions to EOE and either controlled the use of its donations or had reason to know of the purpose of the contributions. Froehle contemporaneously served AEP and EOE. Moreover, James B. Hadden, an attorney who had represented AEP, served as President and director of EOE. EOE's directors, including those connected to AEP, directed the Company's contributions to Householder's criminal enterprise.

59. The Board also reviewed and discussed HB6 specifically. In light of the amendments proposed by AEP, which were in fact adopted into law, these discussions raise a reasonable inference that the Board either directed AEP's engagement and involvement with Householder or had knowledge of it:



(a)

(b)

60.

(a) 

(b)

61.     AEP's PAC and its executives also made contributions to Householder's campaign directly:

(a)     According to the Energy and Policy Institute and the Columbus Dispatch, on May 20, 2019, AEP's PAC contributed to $12,500 to Householder's June 6, 2019 birthday fundraiser.   According to the federal affidavit in the criminal case against Householder, this fundraiser was held one day before the week Generation Now was set to spend $2 million on media in support of H6.

(b)     Between October 18 and November 18, 2019, 39 AEP employees contributed to Householder's campaign.  The largest contribution was from defendant Akins, who donated $5,000.  Specifically:

**11/7/2019 Householder event:**

- $1,500 from Lisa Barton, AEP's executive vice president of utilities, who oversees the activities of all of the utility's operating companies

- $1,500 from Lana Hillebrand, AEP's chief administrative officer

- $1,500 from Charles Patton, AEP's executive vice president of external affairs

- $1,500 from Charles Zebula, AEP's executive vice president of energy supply

- 1,500 from Raja Sundararajan, president and CEO of AEP Ohio

**11/17/2019 Householder event:**

- $1,500 from David Feinberg, AEP's executive vice president, general counsel and secretary

- $1,500 from Mark McCollough, AEP executive vice president of transmission

- $1,000 from Paul Chodak, executive vice president of generation

Brian Tierney, AEP's chief financial officer contributed an additional $1,500 on November 17[, 2019].

(c)     AEP also contributed to seven Ohio state representatives after they joined the 15-member Ohio House Select Committee on Energy Policy and Oversight, which was tasked with repealing and replacing HB6.  The Company's PAC contributed a total of $7,500 to the campaigns of seven state representatives in September 2020.

62.    During AEP's conference call held in connection with the second quarter 2020 financial results, defendant Akins admitted that "Starting in 2015, AEP contributed a total of $8.7 million to Empowering Ohio's Economy."  He stated that "publicly available tax forms filed by Empowering Ohio's Economy shows that it made a number of grants over time to a wide variety of charitable organizations under 501(c)(3) and social welfare organizations under 501(c)(4)."  The grant agreement between EOE and Generation Now shows that the contributions were precisely

of the type used in connection with the Householder bribery scandal. Specifically, the agreement permits Generation Now to use AEP's contributions for "educating, equipping, mobilizing our citizens to take action on critical economic and legislative issues," and EOE's 2019 Form 990 confirms that it "received documentation from the organization that received grants during the year which ensures the funds are not otherwise diverted from their intended use."

63. During the same conference call, defendant Akins also acknowledged that the Company's disclosures with respect to political donations were incomplete in that 501(c)(4) organizations are not required to disclose their donors. Defendant Akins stated that "[w]ith that in mind, we will commit to include additional disclosures in our corporate accountability report with respect to contributions that we made to 501(c)(4) organizations in 2020 and going forward."

64. ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████

65. ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████    ███████

███████████████████████████████████████████

███████████████████████████

### C.    The Individual Defendants Cause the Company to Issue Materially Misleading Statements

66.    On April 25, 2019, AEP held a conference call to discuss its first quarter 2019 financial results. During the call, defendant Tierney stated that while AEP "is supportive of the Ohio House leadership's focus and efforts," the company identified "certain issues that must be addressed." Specifically, he stated:

> Now to the Ohio clean air fund legislation. The company is supportive of the Ohio House leadership's focus and efforts on addressing key energy policy issues that have plagued the state for years. In order for the legislation to benefit all Ohio customers, there are certain issues that must be addressed.

> First, an elimination of the renewable portfolio standard should be replaced with the opportunity for utilities to voluntarily develop economic renewable resources in the state. In addition, contracts entered into under the existing renewable portfolio standard must be grandfathered so as to not punish utilities who are compliant with Ohio law.

> Second, in regards to energy efficiency. AEP is concerned about a rapid elimination of EE programs that have benefited our customers for many years. In lieu of immediate elimination of EE programs, previously approved plans should be phased out over the next several years. We look forward to working with lawmakers during the process to achieve a balanced energy bill that provides benefits to all Ohio customers.

67.    During the same call, defendant Tierney emphasized that AEP was interested in benefitting "all Ohio customers" and that "[i]f it's just a bailout for one company or another, it's not as beneficial to all Ohio customers." Specifically, he stated:

> [PAUL PATTERSON:] Okay. And then with respect to the Ohio legislation, previously, you guys, I think, had concerns about AEP utility ratepayers paying for other companies' nuclear plants. How do you guys feel about HB 6 as it currently stands? I mean I know you raised a couple of the issues in your prepared remarks this morning. Can you just give a little more color on that?

> [BRIAN X. TIERNEY:] So we think if there's a full package where all of Ohio customers can benefit, then it's a worthy effort. If it's just a bailout for one company

or another, it's not as beneficial to all Ohio customers. So there needs to be a full package of things that get addressed. And energy efficiency, the renewable portfolio standard, ability of utilities to invest in renewables going forward are all important things that need to be in the bill. And if they're not, it's not as beneficial for ratepayers in the state.

68.     The above statements in ¶¶ 66-67 were materially misleading because they failed to disclose that: (1) AEP did not support HB6 as it was introduced to the House in April 2019 because it lacked any cost-recovery provision as to AEP's own coal-fired plants; (2) the Company made substantial contributions to Householder's criminal enterprise to secure a bailout for AEP's plants; and (3) these contributions were directed through the Company's non-profit, EOE, so as to conceal AEP's involvement and to work around the Company's policy providing that "AEP cannot lawfully make Corporate Political contributions to candidates for elected office."

69.     On May 9, 2019, the Individual Defendants caused AEP to release its 2019 Corporate Accountability Report, available at www.aepsustainability.com, in which the Company disclosed its lobbying and political contributions:

**Lobbying and Political Contributions**

\*       \*       \*

The investments needed to modernize the power grid are in the billions of dollars, and the stakes have never been higher. ***To understand the policies and regulations that could affect our business, we participate in a number of organizations, lobby on our customers' behalf and contribute to political candidates, where allowed by law.***

***Each year, AEP publicly discloses lobbying activities and political contributions.*** We also annually report on the portions of membership dues paid to organizations such as the U.S. Chamber of Commerce and Edison Electric Institute (EEI) that go toward lobbying. We post our lobbying policy online and we discuss political contributions annually with AEP's Board of Directors' Committee on Directors and Corporate Governance.

\*       \*       \*

22

> *We believe in transparency and active participation in public debate. Our experience is that open, candid discussion and a good-faith attempt to reach common ground is the best way to do business.*

70.     The above statements in ¶ 69 were materially misleading because they failed to disclose that: (1) the Company made substantial contributions to Householder's criminal enterprise to secure a bailout for AEP's plants; and (2) these contributions were directed through the Company's non-profit, EOE, so as to conceal AEP's involvement and to work around the Company's policy providing that "AEP cannot lawfully make Corporate Political contributions to candidates for elected office."

71.     On July 25, 2019, the Individual Defendants caused AEP to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019 (the "2Q19 10-Q"). It contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Akins and Tierney attesting that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The 2Q19 10-Q stated that management "cannot estimate the impact on results of operations, cash flows or financial condition" of HB6 because the Company was "analyzing the impact of this legislation." Specifically, it stated:

- In July 2019, clean energy legislation which offers incentives for power-generating facilities with zero- or reduced carbon emissions was signed into law by the Ohio Governor. The clean energy legislation phases out current energy efficiency and renewable mandates after 2020 and 2026, respectively. The bill also provides for the recovery of existing renewable energy contracts on a bypassable basis through 2032 and includes a provision for recovery of certain legacy generation resources which will be allocated to all electric distribution utilities on a non-bypassable basis. *Management is analyzing the impact of this legislation and at this time cannot estimate the impact on results of operations, cash flows or financial condition.*

72. The above statements in ¶ 71 were materially misleading because they failed to disclose that: (1) AEP's executives worked directly with Householder to add cost recovery provisions to the bill while Froehle advocated for the same provisions in the Ohio legislature; (2) AEP calculated how HB6 would impact the Company's financial performance, including that it would allow AEP to avoid impairment charges; (3) the Company made substantial contributions to Householder's criminal enterprise to secure a bailout for AEP's plants; and (4) these contributions were directed through the Company's non-profit, EOE, so as to conceal AEP's involvement and to work around the Company's policy providing that "AEP cannot lawfully make Corporate Political contributions to candidates for elected office."

73. The same day, the Company held a conference call in connection with the release of its second quarter 2019 financial results. During the call, defendant Akins discussed HB6, stating:

> Now onto the next hot issue, the Ohio House Bill 6 legislation. Governor DeWine earlier this week signed legislation that will provide support to the nuclear units in Ohio as well as support for the OVEC generating units. While the legislation phases out the RPS mandate after 2026, it still provides benefits for the recovery of existing renewable contracts until 2032 and provides additional support for solar projects that have already received signing approval, including our 400 megawatts of proposed solar project, which can also collect from the same clean energy fund as the nuclear units.
>
> ***So to reiterate, as far as AEP is concerned, we see positives from this legislation for us, namely recovery of OVEC collected – that's collected on a statewide basis through 2030.*** Secondly, recovery of our existing renewable contracts entered into to comply with previous legislation and approved by the PECO. The opportunity for AEP Ohio to enter into bilateral contracts with certain customers. This one is an important issue for AEP as we have had specific requests from various customers for AEP Ohio to be the provider of renewable resources in addition to being the wires provider.
>
> And fourth, the ability for solar projects that have siting board approval to access the $20 million of the clean air funds, which includes the 400 megawatts of solar that we now have before the PECO. The access to these funds make these particular projects even more beneficial for customers and, as you recall, the request for these

projects include a $6 million per year debt equivalency rider to maintain AEP Ohio's capital structure.

And finally, the net impact of HB 6 will provide headroom to our rate payers, which will enable potential additional distribution investments to improve the customer experience and grid reliability.

AEP does believe in the importance of nuclear generation as a part of the portfolio of this country and the State of Ohio. We congratulate Speaker Householder; Senate President Obhof; Governor DeWine; Lieutenant Governor Husted and Chairman Randazzo, along with many other members of the Ohio legislature in balancing the interest of a need for a balanced portfolio, employment and economic development issues and customer benefits.

74.     The above statements in ¶ 73 were materially misleading because they failed to

disclose that: (1) the Company made substantial contributions to Householder's criminal enterprise

to secure a bailout for AEP's plants; and (2) these contributions were directed through the

Company's non-profit, EOE, so as to conceal AEP's involvement and to work around the

Company's policy providing that "AEP cannot lawfully make Corporate Political contributions to

candidates for elected office."

75.     On September 16, 2019, the Individual Defendants caused AEP to publish a

newsletter entitled "Regulatory News: What's going on with PJM's BRA and House Bill 6?"  In

the newsletter, AEP explained HB6 and its impact on the Company, stating:

**What is Ohio's HB 6?**

When initially introduced, the purpose of the legislation was for all Ohio electricity customers to pay to keep open Lake County's Perry and Ottawa County's Davis-Besse nuclear plants, owned by FirstEnergy Solutions (FES), a subsidiary of FirstEnergy Corp. ***However, the goal of the legislation expanded to support additional renewable energy resources while eliminating certain utility energy efficiency activities and renewable portfolio compliance standards.*** The expansion to HB 6 came with the expectation that distribution charges would be reduced by eliminating the energy efficiency rider charge while promoting clean air resources.

On July 24, 2019, Ohio Governor Mike DeWine signed into law HB 6 . This law creates the Nuclear Generation Fund and the Renewable Generation Fund, to be administered by the Ohio Air Quality Development Authority. These funds allow

for a "qualifying nuclear resource" or a "qualifying renewable resource" to be eligible for participation in the programs for one or more program years, as determined by the Authority.

\*       \*       \*

**What are the details of each provision in HB 6?**

\*       \*       \*

*Renewable Funding Opportunity*

HB 6 supports eligible solar facilities over 50MW that already have siting certification as of June 2019. ***AEP Ohio has two eligible solar renewable facilities located in Highland County.*** These are the Willowbrook project (100MW) and the Hecate project (300MW).

***Through the renewable funding opportunity, a $9 per MWh credit is paid to project owners of eligible solar facilities for a total of $20 million annually, which covers about 1,000MW of solar.*** This credit is assessed from the $20 million renewable portion of the Clean Air Fund as described above.

*OVEC Statewide Recovery*

The Ohio Valley Electric Corporation (OVEC) and the Indiana-Kentucky Electric Corporation (IKEC) are generating stations originally built in the 1950s and provided electric power for the U.S. Department of Energy's uranium enrichment facilities then near Portsmouth, Ohio. Today, OVEC and IKEC own two coal power plants; Kyger Creek Generating Station (1.1GW) in Cheshire, Ohio and Clifty Creek Generating Station (1.3GW) in Madison, Indiana. Under HB 6, OVEC and IKEC will receive subsidies to support their coal-fired power plants.

***Effective January 1, 2020, distribution customers throughout Ohio will incur a non-bypassable charge, called the Purchased Power Agreement (PPA) Rider. The rider for residential customers is $1.50 per month. Commercial and industrial customers' monthly charge is $1,500 for this rider.*** The PPA Rider will begin in 2021 and will be reviewed by the Commission every three years to determine continuation of the rider, which is to end December 31, 2030.

*Reduced Renewable Portfolio Standards*

In 2008, the State of Ohio established their Renewable Portfolio Standards (RPS) policy. This policy required providers selling electricity to consumers to provide a specific percentage of that supply from renewable sources. Currently, the RPS policy states 12.5% of your electricity must come from renewable energy sources by 2027, with 0.5% required to be solar.

*HB 6 reduces the RPS target for utilities and competitive retail energy suppliers to 8.5%, and the solar portion is eliminated by December 31, 2026.* This means that most Ohio customers will see a price reduction by the elimination of RPS requirements effective January 1, 2027. *However, an AEP Ohio customer should read the section below on the AEP Ohio bypassable renewable legacy charge, as you will continue to receive this charge through 2032.*

76.     The same newsletter also discussed the referendum to repeal HB6, stating:

*Potential Referendum on Ohio HB 6*

Groups are forming a campaign to add a referendum on the November 2020 ballot to repeal HB 6. Opponents include environmental groups opposed to the elimination of energy efficiency programs and developers of natural gas-fired power plants opposed to the subsidy for nuclear generation. These groups are circulating a petition, seeking 1,000 signatures from registered Ohio voters in hopes of adding a referendum to the 2020 election.

The petition was approved by the Ohio Attorney General David Yost on August 29, 2019. *The next step opponents will take is to obtain approximately 266,000 additional signatures to place the petition on the November 2020 ballot for a vote.* Finally, a majority vote is needed to approve the petition for the repeal of HB 6.

*Meanwhile FES [FirstEnergy Solutions Corp., now Energy Harbor Corp.] filed a challenge to the petition with the Supreme Court of Ohio on September 4, stating HB 6 is a tax and tax laws are exempt from referendums.*

This petition process will take a long time before being resolved and may create market uncertainty for everyone at each step of the process. This uncertainty may impact energy supply plans and strategies for all involved.

77.     The above statements in ¶¶ 75-76 were materially misleading because they failed to disclose that: (1) the Company made substantial contributions to Householder's criminal enterprise to secure a bailout for AEP's plants; (2) these contributions were directed through the Company's non-profit, EOE, so as to conceal AEP's involvement and to work around the Company's policy providing that "AEP cannot lawfully make Corporate Political contributions to candidates for elected office."; and (3) AEP contributed to fund the opposition to the referendum.

78.     On October 24, 2019, the Individual Defendants caused AEP to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2019 (the "3Q19 10-Q").

The report contained SOX certifications signed by defendants Akins and Tierney attesting that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Regarding HB6, the 3Q19 10-Q stated:

> In July 2019, clean energy legislation which offers incentives for power-generating facilities with zero or reduced carbon emissions was signed into law by the Ohio Governor. The clean energy legislation phases out current energy efficiency and renewable mandates no later than 2020 and after 2026, respectively. The bill provides for the recovery of existing renewable energy contracts on a bypassable basis through 2032. ***The clean energy legislation also includes a provision for recovery of OVEC costs through 2030 which will be allocated to all electric distribution utilities on a non-bypassable basis.*** OPCo's Inter-Company Power Agreement for OVEC terminates in June 2040. To the extent that OPCo is unable to recover the costs of renewable energy contracts on a bypassable basis by the end of 2032, recover costs of OVEC after 2030 or fully recover energy efficiency costs through 2020 it could reduce future net income and cash flows and impact financial condition.

79. The above statements in ¶ 78 were materially misleading because they failed to disclose that: (1) the Company made substantial contributions to Householder's criminal enterprise to secure a bailout for AEP's plants; and (2) these contributions were directed through the Company's non-profit, EOE, so as to conceal AEP's involvement and to work around the Company's policy providing that "AEP cannot lawfully make Corporate Political contributions to candidates for elected office."

80. On February 20, 2020, the Individual Defendants caused AEP to file its annual report on Form 10-K with the SEC for the period ended December 31, 2019 (the "2019 10-K"), which was signed by the Individual Defendants. It also contained SOX certifications signed by defendants Akins and Tierney attesting that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

667481 2

circumstances under which such statements were made, not misleading with respect to the period

covered by this report." The 2019 10-K stated, as to HB6:

> In January 2020, provisions enacted as part of Ohio Am. Sub. H.B. 6 went into
> effect that replace the PPA rider and enable OPCo to continue recovering the net
> cost associated with the ICPA [Inter-Company Power Agreement], including any
> additional contractual entitlement received as a result of the FirstEnergy Solutions
> (FES) bankruptcy, through 2030.

81.     The above statements in ¶ 80 were materially misleading because they failed to

disclose that: (1) the Company made substantial contributions to Householder's criminal enterprise

to secure a bailout for AEP's plants; and (2) these contributions were directed through the

Company's non-profit, EOE, so as to conceal AEP's involvement and to work around the

Company's policy providing that "AEP cannot lawfully make Corporate Political contributions to

candidates for elected office."

82.     On May 20, 2020, the Individual Defendants caused AEP to release its 2020

Corporate Accountability Report, in which the Company disclosed its lobbying and political

contributions:

> At AEP, we never have been more certain of our responsibility to a sustainable
> future for our customers, communities and employees. We will continue to take
> steps to reduce our carbon footprint, to empower customers and to value and
> develop our workforce. Together, our energy and future are truly boundless.
>
> *     *     *
>
> **Public Policy & Issue Management**
>
> Similar to other companies, AEP has a public policy strategy that seeks to inform
> decisions made by Congress, the Federal Energy Regulatory Commission (FERC),
> North American Electric Reliability Corporation (NERC), state legislatures and
> regulatory commissions, and Regional Transmission Organizations (RTOs).
>
> AEP's Policy Advisory Team (PAT), consisting of senior executives across all
> business functions and departments, considers policy options on issues of relevance
> to the company and supports internal policy analysis and debate. This approach
> ensures that AEP is speaking with one voice and that all employees with external

contacts are clear on our policy positions and objectives. Since its inception in May 2017, the PAT has reviewed more than two dozen issues, including 13 in 2019.

\*    \*    \*

**Climate & Lobbying**

Some stakeholders are asking AEP whether our lobbying practices and the policy positions taken by trade organizations to which we belong are in alignment with the Paris Climate Agreement. ***We believe in transparency and active participation in public policy development, regardless of the issue or position.*** Moreover, AEP is a respected and sought-after voice when it comes to energy policy-related matters in the U.S.

***We report on our public policy positions, annual lobbying and political contributions, policy on political contributions and trade association memberships.*** We post our lobbying policy online and have consistently acknowledged our intent to participate actively in the political process and in lobbying activities at the national, state and local levels. At AEP, we must consider a number of factors when engaging in this arena, as public policy develops through negotiation and compromise. While many divergent issues are of importance to us, we cannot invest all of our efforts to focus on a single issue. We are obligated to deliver safe, reliable, affordable and secure electricity to all of our customers, and we develop our public policy positions with that in mind.

83.     The above statements in ¶ 82 were materially misleading because they failed to disclose that: (1) the Company made substantial contributions to Householder's criminal enterprise to secure a bailout for AEP's plants; and (2) these contributions were directed through the Company's non-profit, EOE, so as to conceal AEP's involvement and to work around the Company's policy providing that "AEP cannot lawfully make Corporate Political contributions to candidates for elected office."

**D.     The Truth Begins to Emerge**

84.     On July 26, 2020, the *Columbus Dispatch* published an article entitled "Columbus utility giant AEP funded dark money spending in HB 6 campaign," revealing the Company's involvement in the passage of HB6.  Specifically, it stated:

***A dark-money group wholly funded by House Bill 6 beneficiary and Columbus utility giant American Electric Power contributed $350,000 toward the***

30

*campaigns now at the center of a racketeering and bribery case that ensnared House Speaker Larry Householder, an investigation by The Dispatch finds.*

*Empowering Ohio's Economy Inc., a nonprofit operated solely with AEP funds, gave $150,000 to Generation Now, another dark-money group* that received $60 million from FirstEnergy-related interests to ensure passage and survival of a $1 billion ratepayer bailout of a subsidiary's pair of nuclear power plants.

Empowering Ohio also gave $200,000 to the Coalition for Opportunity & Growth, which is related to a similarly named political action committee that spent $1 million in the 2018 campaigns of Householder-favored Republican candidates to help ensure that he had their votes to become speaker.

*An affidavit filed by an FBI agent in the racketeering case details spending of $350,000 by an unidentified "interest group that was funded exclusively by $13 million from another energy company that supported HB 6."*

*A source close to the investigation confirmed to The Dispatch that the energy company is American Electric Power*, a publicly traded company that serves 5.5 million customers in 11 states and earned $2.1 billion last year.

The "social welfare" nonprofit is not required to disclose its donors or the source of its funding.

*       *       *

*AEP benefited from the passage of House Bill 6 with its six-year-plus extension through 2030 of a monthly surcharge of up to $1.50 on Ohio [residential] electricity customers. Industrial and commercial customers can pay up to $1,500 a month. The fee generates about $50 million a year to subsidize a pair of old coal-burning power plants it partly owns in a consortium with other utilities.*

The plants – Kyger Creek near Cheshire, Ohio, and Clifty Creek near Madison, Indiana – were built in the mid-1950s to supply electricity to the former uranium-enrichment plant near Piketon, Ohio. *AEP owns the biggest stake in the coal plants at 43% and buys about 60% of the electricity generated by the plants.*

*       *       *

American Electric Power's political action committee contributed nearly $672,000 to Ohio politicians and parties between 2016 and mid-2020, including $17,250 to Householder and $86,792 to the House Republicans' campaign account.

*       *       *

Empowering Ohio's Economy spent $162,500 on lobbying between 2016 and 2018, according to its tax filings. *The group was not registered with the state as attempting to influence legislation.*

31

*The Coalition for Opportunity & Growth, the independent-expenditure political action committee which received $200,000 from the AEP dark-money group in 2017, the dark-money Coalition & Opportunity PAC that backed Householder candidates and Generation Now* all were incorporated by Eric Lycan, a lawyer and Republican consultant in Lexington, Kentucky.

While not identified in the affidavit, the Coalition for Opportunity & Growth cash went largely unused until early this year, when it went out to support Householder-blessed candidates in the GOP primary, the FBI affidavit said.

*It was laundered through the related PAC to conceal its association with Generation Now, the FBI affidavit states: "Generation Now had generated negative media publicity in 2019 and candidates expressed concern to Householder about their association with it."*

The FBI affidavit said FirstEnergy interests provided $390,000 to the group, which paid $54,000 to Generation Now, $191,000 to a media-placement firm, $200,000 to a public relations firm and $100,000 to JPL & Associates, a firm controlled by Jeff Longstreth, Householder's top political aide. Longstreth is among those arrested and facing up to 20 years in prison if convicted in the H.B. 6 case.

\*　　\*　　\*

Householder and four others were arrested Tuesday following an FBI investigation that captured phone calls, text messages and recordings of meetings centering around *the alleged pay-to-play scheme described by U.S. Attorney Dave DeVillers as the largest public corruption case in Ohio history.*

85.    On this news, the Company's share price fell $4.67 per share, or over 5%, to close

at $81.16 per share on July 27, 2020, on unusually heavy trading volume.

86.    On December 2, 2020, additional details surfaced when *Dayton Daily News*

reported that AEP contributed $900,000 to the groups at the center of the HB6 scandal.

Specifically, the article stated:

A nonprofit funded by Columbus-based American Electric Power gave $900,000 over three years to two groups that don't have to disclose their donors and are involved in a federal public corruption investigation, records show.

IRS documents filed in November and obtained by the Dayton Daily News show the nonprofit Empowering Ohio's Economy Inc. donated $550,000 in 2019, $50,000 in 2018 and $100,000 in 2017 to Generation Now, which federal prosecutors allege was the primary vehicle for funneling bribes to former Ohio House Speaker Larry Householder.

32

Empowering Ohio's Economy also gave $200,000 to Coalition for Growth & Opportunity, another nonprofit group linked to the federal case.

**E.      Akins, Tierney, and Beasley Sold More than $16 Million in AEP Stock While in Possession of Material Non-Public Information**

<u>Akins</u>

87.      Defendant Akins was the Company's CEO with a highly sophisticated understanding of the Company's involvement with HB6.

88.      As set forth herein, defendant Akins possessed material negative information which he knew was being concealed from investors. Defendant Akins consciously acted to exploit his knowledge by selling nearly $12.5 million of AEP stock to his substantial benefit, as follows:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 5/1/2017 | 19,829 | $67.64 | $1,341,234 |
| 5/1/2018 | 19,184 | $68.63 | $1,316,598 |
| 5/1/2019 | 5,457 | $83.67 | $456,587 |
| 5/2/2019 | 11,152 | $84.94 | $947,251 |
| 2/24/2020 | 1,900 | $102.20 | $194,180 |
| 2/24/2020 | 37,807 | $100.57 | $3,802,250 |
| 2/24/2020 | 29,950 | $101.58 | $3,042,321 |
| 5/4/2020 | 5,632 | $81.97 | $461,655 |
| 5/4/2020 | 5,813 | $80.99 | $470,795 |
| 5/4/2020 | 5,074 | $82.87 | $420,482 |
| | **141,798** | | **$12,453,353** |

89.      Defendant Akins thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

<u>Tierney</u>

90.      Defendant Tierney is the CFO of the Company with a highly sophisticated understanding of the Company's involvement with HB6.

91.      As set forth herein, defendant Tierney possessed material negative information which he knew was being concealed from investors. Defendant Tierney consciously acted to

exploit his knowledge by selling over $2.5 million of AEP stock to his substantial benefit, as follows:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 5/1/2017 | 5,586 | $67.64 | $377,837 |
| 5/1/2018 | 3,464 | $68.63 | $237,734 |
| 5/1/2019 | 1,539 | $83.67 | $128,768 |
| 5/1/2019 | 1,402 | $84.95 | $119,100 |
| 5/14/2019 | 4,392 | $86.02 | $377,800 |
| 7/29/2019 | 4,458 | $89.73 | $400,016 |
| 2/24/2020 | 18,573 | $101.55 | $1,886,088 |
| | **39,414** | | **$3,527,343** |

92.     Defendant Tierney thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

Beasley

93.     Defendant Beasley is a director of the Company with a highly sophisticated understanding of the Company's involvement with HB6.

94.     As set forth herein, defendant Beasley possessed material negative information which he knew was being concealed from investors. Defendant Beasley consciously acted to exploit his knowledge by selling over $157,155 worth of AEP stock to his substantial benefit on February 26, 2020 when he sold 1,613 shares for $97.43 per share. Following such sale, defendant Beasley did not hold any shares of AEP stock.

95.     Defendant Beasley thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

## VI.     DAMAGES TO THE COMPANY

96.     As a direct and proximate result of the Individual Defendants' conduct, AEP has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

34

a) Expenses incurred in connection with investigations regarding AEP's involvement with HB6 and Householder's criminal enterprise;

b) Any funds paid to settle the Securities Class Action; and

c) Costs incurred from compensation and benefits paid to the defendants who have breached their duties to AEP.

97. In addition, AEP's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired. The Company still has not fully admitted the nature of its false statements and the true condition of its business. The credibility and motives of management are now in serious doubt.

98. The actions complained of herein have irreparably damaged AEP's corporate image and goodwill. For at least the foreseeable future, AEP will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that AEP's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

99. Plaintiff brings this action derivatively in the right and for the benefit of AEP to redress injuries suffered, and to be suffered, by AEP as a direct result of breaches of fiduciary duty by the Individual Defendants, insider trading, and contribution for violations of Section 10(b) of the Exchange Act. AEP is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

100. Plaintiff will adequately and fairly represent the interests of AEP in enforcing and prosecuting its rights.

101. Plaintiff has continuously been a shareholder of AEP at times relevant to the wrongdoing complained of and is a current AEP shareholder.

102. When this action was filed, AEP's Board of Directors consisted of defendants Akins, Hoaglin, Anderson, Beasley, Crosby, Garcia, Goodspeed, Lin, McCarthy, Notebaert, Rasmussen, Richard, Tucker and non-party director Roberts. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

103. Akins is the Company's CEO, and therefore is not independent under NASDAQ listing rules. As an employee, Akins derives substantially all of his income from his employment with AEP, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis. Moreover, as CEO and as alleged herein, Akins personally issued the misleading statements alleged herein and faces a substantial risk of liability in the Securities Class Action. As a result, Akins would be interested in a demand regarding his own wrongdoing and demand is futile as to him.

104. Hoaglin, Garcia, Lin, Notebaert, Nowell, Rasmussen, and Tucker served as the members of the Governance Committee at all relevant times. As such, they are responsible for the Company's corporate governance matters, including reviewing AEP's political contributions. In their capacities as Governance Committee members, as alleged herein, Hoaglin, Garcia, Lin, Notebaert, Nowell, Rasmussen, and Tucker reviewed and discussed ███████████████████ ███████████████████████████████████████████████████████, and therefore knew or should have known of AEP's contributions to EOE and Generation Now.[1] Moreover, as

---

[1] In response to the Stockholder's demand, Company counsel represented that █████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████ However, defendant Akins admitted that the Company had contributed $8.7 million to EOE since 2015, and the books and

AEP is the sole contributor to EOE, these directors had reason to know that these funds would be used to improperly influence the environmental legislation in Ohio through Householder, including through Froehle who simultaneously served EOE as director and AEP as VP of External Affairs. Thus, the Governance Committee members knew or recklessly ignored the bribery activities which presented a risk of regulatory and criminal scrutiny of AEP. As alleged herein, Hoaglin, Garcia, Lin, Notebaert, Nowell, Rasmussen, and Tucker breached their fiduciary duties and are not disinterested, and demand is excused as to them.

105. Hoaglin, Anderson, Garcia, Godspeed, Lin, and McCarthy served as the members of the Audit Committee at all relevant times. As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations. In their capacities as Audit Committee members, Hoaglin, Anderson, Garcia, Godspeed, Lin, and McCarthy reviewed and approved the disclosures regarding the impact of HB6 on the Company's operations. These directors also knew of OVEC dire financial condition, as it had approximately $1.3 billion of debt with only $3 million in net income, and of AEP's financial risk exposure to OVEC, in which the Company held a nearly 44% stake. As a result, the Audit Committee members knew or should have known of the Company's involvement in the passage of HB6 to evaluate its financial impact on AEP's operations, but failed to disclose the same and allowed the materially misleading statements to be disseminated in AEP's SEC

---

records production discloses ████████████████████████ indicating that the Company's management and directors knew of or had reason to know of the contributions to EOE. Or, if they did not know of the contributions to EOE, then Hoaglin, Garcia, Lin, Notebaert, Nowell, Rasmussen, and Tucker face a substantial risk of liability for their failure to institute internal controls with respect to political contributions because they were wholly unaware of the significant amount and use of funds contributed by AEP to EOE, an entity that operates solely with AEP's funds.

filings and other disclosures. Thus, Hoaglin, Anderson, Garcia, Godspeed, Lin, and McCarthy breached their fiduciary duties and are not disinterested, and demand is excused as to them.

106. Akins, Hoaglin, Anderson, Beasley, Crosby, Garcia, Goodspeed, Lin, McCarthy, Notebaert, Nowell, Rasmussen, Richard, and Tucker served as the members of the Policy Committee at all relevant times. As such, they are responsible for evaluating major public issues affecting the Company, as well as established policies that affect AEP's relationship with its service areas. In their capacities as Policy Committee members, Akins, Hoaglin, Anderson, Beasley, Crosby, Garcia, Goodspeed, Lin, McCarthy, Notebaert, Nowell, Rasmussen, Richard, and Tucker necessarily reviewed and discussed the impact of HB6 on the Company's operations and on AEP's relationship with Ohioans. As a result, the Policy Committee members knew or should have known of the Company's involvement in the passage of HB6 to evaluate its financial impact on AEP's operations, but failed to disclose the same and allowed the materially misleading statements to be disseminated in AEP's SEC filings and other disclosures. Thus, Akins, Hoaglin, Anderson, Beasley, Crosby, Garcia, Goodspeed, Lin, McCarthy, Notebaert, Nowell, Rasmussen, Richard, and Tucker breached their fiduciary duties and are not disinterested, and demand is excused as to them.

## COUNT I

### Against Defendants Akins and Tierney for Breach of Fiduciary Duty

107. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108. Defendants Akins and Tierney each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AEP's business and affairs, particularly with respect to issues as fundamental as public disclosures.

109.    The conduct by defendants Akins and Tierney set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. Defendants Akins and Tierney intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AEP.

110.    In breach of their fiduciary duties owed to AEP, defendants Akins and Tierney willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

111.    In particular, defendants Akins and Tierney knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

112.    As a direct and proximate result of the breaches of their fiduciary obligations by defendants Akins and Tierney, AEP has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, defendants are liable to the Company.

## **COUNT II**

### **Against Akins, Tierney, and Beasley – Breach of Duty for Insider Trading**

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.    As alleged above, Akins, Tierney, and Beasley are fiduciaries of AEP, possessed material, non-public information of AEP, and used that information improperly to profit from sales of AEP stock. When Akins, Tierney, and Beasley directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

115.     When Akins, Tierney, and Beasley sold their AEP stock, they knew that the investing public was unaware of the negative material information that they possessed. They also knew that if the information were disclosed, the market price of AEP stock would be significantly lower. Akins, Tierney, and Beasley timed their stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold. They thereby benefitted by misappropriating AEP's non-public information.

116.     Plaintiff has no adequate remedy at law.

## COUNT III

**(Against Defendants Akins and Tierney for Contribution For Violations of Sections 10(b) and 21D of the Exchange Act)**

117.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.     The conduct of Defendants Akins and Tierney, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

119.     AEP is named as a defendant in related securities fraud lawsuit that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If AEP is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

667481 2

120.     As officers, directors and otherwise, Defendants Akins and Tierney had the power or ability to, and did, control or influence, either directly or indirectly, AEP's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

121.     Defendants Akins and Tierney are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

122.     Defendants Akins and Tierney have damaged the Company and are liable to the Company for contribution.

123.     No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## <u>COUNT IV</u>

**Against the Defendants Hoaglin, Anderson, Beasley, Crosby, Garcia, Goodspeed, Lin, McCarthy, Noebaert, Nowell, Rasmussen, Richard, and Tucker for Breach of Fiduciary Duty**

124.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.     These Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AEP's business and affairs, particularly with respect to issues as fundamental as public disclosures.

126.     These Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  These Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AEP.

667481 2

127. In breach of their fiduciary duties owed to AEP, these Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

128. In particular, these Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

129. As a direct and proximate result of these Defendants' breaches of their fiduciary obligations, AEP has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of AEP, demands judgment as follows:

A. Declaring that plaintiff may maintain this action on behalf of AEP and that plaintiff is an adequate representative of the Company;

B. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C. Directing AEP to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AEP and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

       1.       a proposal to strengthen the Company's controls over financial reporting;

       2.       a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

       3.       a proposal to strengthen AEP's oversight of its disclosure procedures;

       4.       a provision to control insider transactions; and

       5.       a provision to permit the stockholders of AEP to nominate at least three candidates for election to the Board;

       D.       Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of AEP has an effective remedy;

       E.       Awarding to AEP restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

       F.       Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

       G.       Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: April 6, 2021                By: *Andrew Kimble*
                            Andrew Biller
                            Andrew Kimble
                            **BILLER & KIMBLE, LLC**
                            8044 Montgomery Road, Suite 515
                            Cincinnati, Ohio 45236
                            Telephone: (513) 715-8711
                            E-mail: akimble@billerkimble.com

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com
          prajesh@glancylaw.com

**LAW OFFICE OF ALFRED G. YATES, JR.**
Alfred G. Yates, Jr.
300 Mt. Lebanon Boulevard Suite 206B
Pittsburgh, Pennsylvania 15234
Telephone: (412) 391-5164

*Counsel for Plaintiff Robert L. Reese*

667481 2

## AMERICAN ELECTRIC POWER COMPANY, INC. VERIFICATION

I, Robert L. Reese, do hereby verify that I am a holder of common stock of American Electric Power Company, Inc. and was a holder of such common stock at the time of the wrongs complained of in the foregoing Verified Shareholder Derivative Complaint (the "Complaint"). I have reviewed and authorized the filing of the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge, and with respect to the remainder of the averments, are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 3/29/21

Robert L. Reese