UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE AEP STOCKHOLDER DERIVATIVE LITIGATION | Master File No.: 2:21-cv-00163 |
| | District Judge Sarah D. Morrison |

**PLAINTIFFS' MOTION FOR
FINAL APPROVAL OF STOCKHOLDER
DERIVATIVE SETTLEMENT AND APPROVAL
OF THE ATTORNEYS' FEE AND EXPENSE AMOUNT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................ iii

I.  INTRODUCTION ................................................................................. 1

II.  SUMMARY OF ALLEGATIONS AND PROCEDURAL HISTORY .......................... 4

    A.  This Action ............................................................................. 4

    B.  The Ohio State Action ............................................................... 6

    C.  The New York State Action and Litigation Demand ........................... 6

    D.  Settlement Efforts .................................................................... 7

    E.  Preliminary Approval and Notice to Current Stockholders ................... 8

III.  THE CORPORATE GOVERNANCE REFORMS ............................................ 8

IV.  THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND
ADEQUATE AND SHOULD BE FINALLY APPROVED ................................... 10

    A.  Applicable Standard ................................................................ 10

SUMMARY: Fed. R. Civ. P. 23.1 requires Court approval of derivative settlements. Settlements are favored because of difficulty of derivative litigation. *Granada Invs., Inc. v. DWG Corp.*, 1991 WL 338233, at *6 (N.D. Ohio Feb. 12, 1991). Court may consider various factors: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinion of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.'" *Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*, 636 F.3d 235 (6th Cir. 2011).

    B.  The Settlement Satisfies the Criteria for Final Approval ...................... 12

        1.  The Settlement Merits the Presumption of Fairness Because It Is
the Product of Arm's-Length Negotiations Between Experienced
and Well-Informed Adversaries ............................................ 12

SUMMARY: The Settling Parties negotiated the Settlement at arm's-length with the assistance of the Sixth Circuit Mediator.  Plaintiffs' were well-informed having sought and reviewed pre-suit documents, drafting complaints, opposing a motion to dismiss and preparing the appeal.  *In re Broadwing, Inc. ERISA Litig.*, 252

i

F.R.D. 369, (S.D. Ohio 2006).

2.      The Settlement Confers Substantial Benefits on AEP ...............................16

SUMMARY: The principal factor by which to measure a proposed derivative settlement is benefit derived. *City of Plantation Police Officers' Emps.' Ret. Sys. v. Jeffries*, 2014 WL 7404000, at *6 (S.D. Ohio Dec. 30, 2014). Plaintiffs secured significant corporate governance changes that address the alleged wrongdoing and will remain in place for 5 years.

3.      The Settlement Appropriately Balances the Significant Risks and Expense of Continued Litigation with the Benefits Conferred Upon AEP and Current Stockholders ........................................................22

SUMMARY: Balanced against the immediate changes to corporate governance are the risks of continued litigation. Plaintiffs would have to prevail on appeal, overcome any additional challenges to standing demonstrating demand futility, establish the right to continue to litigate even if AEP formed a special litigation committee of independent directors, and face the many risks of taking a case to trial.

4.      The Reaction of Stockholders to the Settlement Supports Final Approval of the Settlement .......................................................................25

SUMMARY: No objections to Settlement at present. Date for objections closes on September 19, 2024. Lack of objections highlights fairness of the proposed Settlement. *Brotherton v. Cleveland*, 141 F. Supp. 2d 894 (S.D. Ohio 2001).

5.      The Public Interest Favors Approval of the Settlement ............................ 27

SUMMARY: Public interest is served through the settlement of complex litigation preserving the resources of both a court and the parties. *Broadwing*, 252 F.R.D. at 376.

V.    THE SEPARATELY NEGOTIATED FEE AND EXPENSE AMOUNT IS FAIR AND REASONABLE AND SHOULD BE APPROVED ...............................................27

A.    The Parties' Agreement Is the Product of Arm's-Length Negotiations ...............27

SUMMARY: The parties negotiated the Fee and Expense Amount with the Sixth Circuit Mediator after the terms of Settlement had been agreed upon.

B.    Application of the Legal Standards Supports Approval of the Agreed Fee and Expense Amount ...........................................................................................31

SUMMARY: Factors for consideration of a derivative fee request include: (i) the value of the benefits rendered; (ii) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (iii) whether the services were undertaken on a contingent fee basis; (iv) the value of the services on an hourly basis; (v) the complexity of the litigation; and (vi) the professional skill and standing of all counsel. *Ramey v. Cincinnati Enquirer*, 508 F.2d 1188, 1196 (6th Cir. 1974).

1.    The Agreed Fee and Expense Amount Is Reasonable in Relation to the Value of the Settlement Benefit ........................................................31

SUMMARY: Under the substantial benefit doctrine, counsel who prosecute a stockholder derivative action resulting in substantial benefits are entitled to fees and expenses in reasonable proportion to the value of the benefits, and taking into account contingency risks. *In re Cardinal Health Inc. Sec. Litigations*, 528 F. Supp. 2d 752 764 (S.D. Ohio 2007). The substantial benefit is that the governance changes will help to prevent a similar recurrence of the alleged wrongdoing, improve AEP's internal controls, and enhance investor confidence.

2.    The Contingent Nature of the Fee and Societal Benefit in Compensation Attorneys Who Produce Substantial Results ....................34

SUMMARY: Granting the fee request will serve society's interest in rewarding attorneys who produce such benefits in order to maintain an incentive to others. *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 2009 WL 1473975, at *4 (S.D. Ohio May 27, 2009). Similarly, a fee award is warranted when counsel absorbed the risk of the litigation and proceeded with the representation on a wholly contingent basis. *Cardinal Health*, 528 F. Supp. 2d at 766.

3.    The Value of the Services on an Hourly Basis ................................................35

SUMMARY: Plaintiffs' Counsel's collective lodestar is $1,481,796.75, which is far in excess of the requested Fee and Expense Amount of $450,000.00.

4.    The Complexity of the Litigation ............................................................36

SUMMARY: Prosecution of derivative action is notoriously difficult and unpredictable. *Granada Invs., Inc. v. DWG Corp.*, 1991 WL 338233, at *6 (N.D. Ohio Feb. 12, 1991).

5.    The Professional Skill and Standing of All Counsel ................................37

SUMMARY: Plaintiffs' Counsel's declarations demonstrated that they are well experienced in prosecuting derivative actions and faced opposing counsel who is also preeminent in area of shareholder litigation.

VI.     THE MODEST SERVICE AWARDS SHOULD BE APPROVED ................................37

SUMMARY: Plaintiffs seek payment of $2,500 payable from the Fee and Expense Amount awarded to Plaintiffs' Counsel.

VII.    CONCLUSION ................................................................................................................37

# TABLE OF AUTHORITIES

Cases                                                                                       Page(s)

*Anixter v. Home- Stake Prod. Co.*,
    77 F.3d 1215 (10th Cir. 1996) ..............................................................................25

*Arledge v. Domino's Pizza, Inc.*,
    No. 3:16-cv-386-WHR,
    2018 U.S. Dist. LEXIS 179474 (S.D. Ohio Oct. 17, 2018) ..................................15

*Arp v. Hohla & Wyss Enters., LLC*,
    No. 3:18-CV-119,
    2020 WL 6498956 (S.D. Ohio Nov. 5, 2020) ......................................................35

*Auerbach v. Bennett*,
    47 N.Y.2d 619 (1979)......................................................................................23, 24

*Bell Atl. Corp. v. Bolger*,
    2 F.3d 1304 (3rd Cir. 1993)..................................................................................18

*Blum v. Stenson*,
    465 U.S. 886 (1984) ..............................................................................................35

*Bowling v. Pfizer, Inc.*,
    143 F.R.D. 141 (S.D. Ohio 1992).........................................................................15

*Brooks v. Am. Exp. Indus., Inc.*,
    71 Civ. 5128,
    1977 U.S. Dist. LEXIS 17313 (S.D.N.Y. Feb. 17, 1977) ....................................15

*Brotherton v. Cleveland*,
    141 F. Supp. 2d 894 (S.D. Ohio 2001).............................................................25, 26

*Bussie v. Allmerica Fin. Corp.*,
    50 F. Supp. 2d 59 (D. Mass. 1999)......................................................................24

*Chun-Hoon v. McKee Foods Corp.*,
    716 F. Supp. 2d 848 (N.D. Cal. 2010).................................................................36

*City of Plantation Police Officers' Emps.' Ret. Sys. v. Jeffries*,
    No. 2:14-cv-1380,
    2014 WL 7404000 (S.D. Ohio Dec. 30, 2014)...............................................11, 16

*Cohn v. Nelson*,
    375 F. Supp. 2d 844 (E.D. Mo. 2005) ......................................................... passim

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001) ...........................................................................12, 15

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
177 F.R.D. 54 (D. Mass. 1997) ...........................................................................24

*Fletcher v. A. J. Indus., Inc.*,
266 Cal. App. 2d 313 (1968) ...............................................................................17

*Garner v. State Farm Mut. Auto. Ins. Co.*,
No. CV 08 1365 CW EMC,
2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) .....................................................12

*Gascho v. Glob. Fitness Holdings, LLC*,
No. 2:11-cv-436,
2014 WL 1350509 (S.D. Ohio April 4, 2014) ......................................................12

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ...............................................................................25

*Granada Invs., Inc. v. DWG Corp.*,
962 F.2d 1203 (6th Cir. 1992) .......................................................................12, 18

*Granada Invs., Inc. v. DWG Corp.*,
No. 1:89CV0641,
1991 WL 338233 (N.D. Ohio Feb. 12, 1991) ................................................10, 27

*Hainey v. Parrott*,
617 F. Supp. 2d 668 (S.D. Ohio 2007) .................................................................15

*Hensley v. Eckerhart*,
461 U.S. 424 (1983) ..............................................................................................27

*Hyland v. HomeServices of Am., Inc.*,
No. 3:05-CV-612-R,
2012 WL 1575310 (W.D. Ky. May 3, 2012) ........................................................27

*In re AOL Time Warner S'holder Derivative Litig.*,
No. 02 Civ. 6302(CM),
2010 WL 363113 (S.D.N.Y. Feb. 1, 2010) ...........................................................28

*In re AOL Time Warner S'holder Derivative Litig.*,
No. 02 CIV. 6302(SWK),
2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006) ........................................................17

*In re Austrian & German Bank Holocaust Litig.*,
    80 F. Supp. 2d 164 (S.D.N.Y. 2000) ...................................................................12

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
    909 F. Supp. 259 (S.D.N.Y. 2012) ....................................................................36

*In re Broadwing, Inc. ERISA Litig.*,
    252 F.R.D. 369 (S.D. Ohio 2006)......................................................14, 25, 27

*In re Cardinal Health Inc. Sec. Litigations*,
    528 F. Supp. 2d 752 (S.D. Ohio 2007)..............................................31, 34, 35

*In re Cendant Corp., Derivative Litig*,
    232 F. Supp. 2d 327 (D.N.J. 2002).....................................................................37

*In re Chickie's & Pete's Wage & Hour Litig.*,
    No. 12–6820,
    2014 WL 911718 (E.D. Pa. Mar. 7, 2014) ....................................................16

*In re Cont'l Ill. Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992).............................................................................30

*In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*,
    248 F.R.D. 483 (E.D. Mich. 2008) ...................................................................13

*In re F5 Networks, Inc. Derivative Litig.*,
    No. C06-794 RSL,
    2011 WL 13195985 (W.D. Wash. Jan. 6, 2011) ...........................................33

*In re Google Inc. S'holder Derivative Litig.*,
    No. CV-11-04248-PJH,
    2015 WL 12990195 (N.D. Cal. Jan. 21, 2015)..........................................28, 32

*In re Intel Corp. Derivative Litig.*,
    No. 09–867–JJF,
    2010 WL 2955178 (D. Del. July 22, 2010)...................................................22

*In re Johnson & Johnson Derivative Litig.*,
    900 F. Supp. 2d 467 (D.N.J. 2012)...............................................................29, 31

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    No. 04 Civ. 8144 (CM),
    2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .............................................36

*In re Nationwide Fin. Servs. Litig.*,
   No. 2:08-CV-00249,
   2009 WL 8747486 (S.D. Ohio Aug. 19, 2009) ............................................................. passim

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
   No. 2:03-MD-1565,
   2009 WL 1473975 (S.D. Ohio May 27, 2009) ....................................................................34

*In re NTL, Inc. Sec. Litig.*,
   No. 02 Civ. 3013 (LAK),
   2007 WL 1294377 (S.D.N.Y. May 2, 2007) ........................................................................36

*In re NVIDIA Corp. Derivative Litig.*,
   No. C-06-06110-SBA (JCS)**,**
   2009 U.S. Dist. LEXIS 24973 (N.D. Cal. Mar. 18, 2009) ...................................................15

*In re Oracle Sec. Litig.*,
   852 F. Supp. 1437 (N.D. Cal. 1994)....................................................................................32

*In re Pac. Enters. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995)................................................................................................22

*In re Pfizer Inc., S'holder Derivative Litig.*,
   780 F. Supp. 2d 336 (S.D.N.Y. 2011) ...........................................................................17, 32

*In re Rambus Inc. Derivative Litig.*,
   No. C 06-3513 JF (HRL),
   2009 WL 166689 (N.D. Cal. Jan. 20, 2009).......................................................................32

*In re Regions Morgan Keegan Sec. Derivative & ERISA Litig.*,
   No. 08-2260,
   2015 WL 11145134 (W.D. Tenn. Nov. 30, 2015). ..............................................................11

*In re Se. Milk Antitrust Litig.*,
   No. 2:08-MD-1000,
   2009 WL 3747130 (E.D. Tenn. Nov. 3, 2009)....................................................................10

*In re Se. Milk Antitrust Litig.*,
   No. 2:07–CV–208,
   2012 WL 2236692 (E.D. Tenn. June 15, 2012) ..................................................................26

*In re Veeco Instruments Sec. Litig.*,
   No. 05 MDL 01695 (CM),
   2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) .......................................................................36

*Ingram v. The Coca-Cola Co.*,
    200 F.R.D. 685 (N.D. Ga. 2001) ........................................................................28

*Jermyn v. Best Buy Stores, L.P.*,
    No. 08 Civ. 214 (CM),
    2012 WL 2505644 (S.D.N.Y. June 27, 2012) .....................................................36

*Johnson v. City of Tulsa*,
    No. 94–CV–39–H(M),
    2003 WL 24015151 (N.D. Okla. May 12, 2003) ...............................................15

*Johnson v. Ga. Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) .............................................................................30

*Karpik v. Huntington Bancshares Inc.*,
    No. 17-CV-1153,
    2021 WL 757123 (S.D. Ohio Feb. 18, 2021) .....................................................35

*Kogan v. AIMCO Fox Chase, L.P.*,
    193 F.R.D. 496 (E.D. Mich. 2000) .....................................................................15

*Levell v. Monsanto Rsch. Corp.*,
    191 F.R.D. 543 (S.D. Ohio 2020) ......................................................................25

*Lewis v. Anderson*,
    692 F.2d 1267 (9th Cir. 1982) ...........................................................................17

*Maher v. Zapata Corp.*,
    714 F.2d 436 (5th Cir. 1983) .............................................................18, 22, 25, 29

*Marx v. Akers*,
    88 N.Y.2d 189 (1996) ........................................................................................23

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970) .....................................................................................17, 31

*Monday v. Meyer*,
    No. 1:10 CV 1838,
    2011 WL 5974664 (N.D. Ohio Nov. 29, 2011) .................................................35

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*,
    688 F.2d 615 (9th Cir. 1982) .........................................................................13, 28

*Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*,
    636 F.3d 235 (6th Cir. 2011) .............................................................................11

*Ramey v. Cincinnati Enquirer,*
    508 F.2d 1188 (6th Cir. 1974) ................................................................31, 32, 34, 35

*Rawlings v. Prudential-Bache Props., Inc.,*
    9 F.3d 513 (6th Cir. 1993) ................................................................................30

*Satchell v. Fed. Express Corp.,*
    No. C03-2659 SI,
    2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ..................................................15

*Shlensky v. Dorsey,*
    574 F.2d 131 (3rd Cir. 1978) ............................................................................29

*Smillie v. Park Chem. Co.,*
    710 F.2d 271 (6th Cir. 1983) ............................................................................30

*Tandycrafts, Inc. v. Initio Partners,*
    562 A.2d 1162 (Del. 1989) ...............................................................................32

*Thacker v. Chesapeake Appalachia, L.L.C.,*
    695 F. Supp. 2d 521 (E.D. Ky. 2010) ..............................................................26

*UAW v. Gen. Motors Corp.,*
    497 F.3d 615 (6th Cir. 2007) ................................................................11, 12, 13

*Unite Nat'l Ret. Fund v. Watts,*
    No. Civ. A. 04CV3603DMC,
    2005 WL 2877899 (D. N. J. Oct. 28, 2005) .....................................................32

*Villanueva v. Morpho Detection, Inc.,*
    No. 13–cv–05390–HSG,
    2015 WL 4760464 (N.D. Cal. Aug. 12, 2015) .................................................12

*Williams v. Vukovich,*
    720 F.2d 909 (6th Cir. 1983) ......................................................................15, 25

*Zapata Corp. v. Maldonado,*
    430 A.2d 779 (Del. 1981) .................................................................................15

Statutes

C.P.L.R. § 3211(a)(4) ................................................................................................7

Fed. R. Civ. P. 23.1 .............................................................................................4, 10

Fed. R. Civ. P. 23.1(c) ................................................................................1, 10

Fed. R. Civ. P. 23(e)(2) ......................................................................................11

N.Y. B.C.L. § 624 .....................................................................................4, 6, 14

Other Authorities

2 Herbert Newberg & Alba Conte,
    *Newberg on Class Actions*, §11.48 (3d ed. 1992) ................................................26

*The Elusive Quest for Global Governance Standards*,
    157 U. Pa. L. Rev. 1263 (May 2009) ....................................................................20

Pursuant to Rule 23.1(c) of the Federal Rules of Civil Procedure and the Stipulation and Agreement of Settlement dated April 30, 2024 (the "Settlement") (ECF No. 54-3), Robert L. Reese ("Reese"), the plaintiff in the above-captioned Action (the "Action"), respectfully moves for Final Approval of Stockholder Derivative Settlement and Approval of the Attorneys' Fee and Expense Amount. This Court entered the Order Preliminarily Approving Settlement and Providing for Notice (the "Preliminary Approval Order") on July 10, 2024 (ECF No. 617).

## I.    INTRODUCTION

The proposed Settlement represents an excellent resolution of the above-captioned stockholder derivative action brought on behalf of and for the benefit of American Electric Power Company, Inc. ("AEP" or the "Company"), a related stockholder derivative action (collectively "Derivative Actions"), and a related stockholder litigation demand ("Demand").[1] The Derivative Actions and Demand arise from allegations that AEP illegally contributed funds to a 501(c)(4) social welfare organization (Empowering Ohio's Economy) that, in turn, contributed to another 501(c)(4) organization (Generation Now) that was controlled by former Ohio House Speaker Larry Householder, who spearheaded passage of Ohio's House Bill 6, which secured $1.3 billion in subsidies for two coal-fired power plants owned, in part, by AEP. Plaintiffs allege that the Defendants knew of Householder's illegal bribery scheme and breached their fiduciary duties by consciously failing to act to halt that wrongdoing and protect AEP from harm.

---

[1]     The Settlement was reached when this Action was before the Sixth Circuit Court of Appeals. The Sixth Circuit has issued a limited remand to provide this Court with jurisdiction to consider whether to approve the Settlement. *See* ECF No. 60.

The proposed Settlement[2] requires AEP to adopt and maintain for a minimum of five (5) years a number of corporate governance reforms that directly address the allegations raised in the Derivative Actions and the Demand and which the parties agree confer substantial benefits on AEP (collectively, the "Reforms"). The Reforms include, *inter alia*: (i) enhanced oversight of political engagement activities conducted by the Company; (ii) the creation of the new position of Chief Compliance Officer—Political Engagement with responsibility for reviewing and approving requests subject to AEP's Political Engagement Policy; (iii) a requirement that the Company publish on its website, at least semi-annually, a Political Engagement Report reflecting the Company's use of corporate funds for political contributions or expenditures or for payments to certain tax-exempt organizations that may use such payments for political or lobbying activities; (iv) enhanced disclosure requirements concerning the individuals at the Company with responsibility for approving such contributions and/or expenditures; (v) amendments to the charter of the management-level Disclosure Committee reflecting its enhanced duties and responsibilities concerning the Company's public disclosures; (vi) the adoption of a new Ethics & Compliance Program Charter; and (vii) enhanced director, officer, and employee training and education. *See* Settlement, Ex. A.

The substantial benefits the Settlement confers on AEP far outweighs the speculative prospect that further litigation might produce a one-time monetary award of substantially greater value, particularly when discounted by the enormous costs, disruption, and delay such litigation would entail, and the substantial risk that further litigation would sacrifice the Settlement benefit

---

[2]     A copy of the Stipulation of Settlement is attached as Exhibit A to the Declaration of Matthew M. Houston in Support of Plaintiffs' Motion for Final Approval of Stockholder Derivative Settlement and Award of Attorneys' Fee and Expense Amount ("Houston Decl."), filed concurrently herewith. All capitalized terms not defined herein shall have the same definitions as set forth in the Stipulation. All citations are omitted and emphasis added unless otherwise noted.

and produce no recovery. Accordingly, Plaintiffs respectfully submit that the Settlement is substantively fair, reasonable, and adequate, and merits final approval.

The Settlement was ultimately reached after an extended negotiation before a Sixth Circuit mediator, warranting the presumption of fairness and reasonableness that courts typically afford compromises reached in non-collusive negotiations among sophisticated parties represented by experienced and informed counsel. The Reforms were agreed to after contentious briefing on Defendants' motion to dismiss (on which defendants prevailed), an appeal filed by plaintiff Reese, and more than six months of protracted settlement negotiations while the appeal was pending, all overseen by Catherine G. Geyer, Esq., Chief Circuit Mediator of the Sixth Circuit Mediation Office (the "Mediator"). Although Defendants deny Plaintiffs' allegations, AEP acknowledges that: (a) Plaintiffs' litigation and settlement efforts were a substantial and material cause of the Company's decision to adopt, implement, and maintain the Reforms; (b) the Reforms confer a substantial benefit upon the Company and its Current Stockholders; and (c) the Settlement is fair, adequate, reasonable, and in the best interests of the Company and its Current Stockholders. Settlement ¶ 3.

After negotiating certain key terms of the Settlement, subject to agreement on final documentation, Plaintiffs' Counsel, Defendants' Counsel, and counsel for AEP's insurers, with the assistance of the Mediator, separately negotiated the attorneys' fees and expenses to be paid to Plaintiffs' Counsel. Accordingly, the agreed Fee and Expense Amount merits the substantial deference generally afforded negotiated awards, and the Court need only determine that the agreed amount falls within a reasonable range. In light of the substantial benefits conferred upon AEP and its Current Stockholders by Plaintiffs' Counsel's efforts, AEP, acting by and through its Board, has agreed that AEP through its Directors & Officers insurer shall cause to be paid to Plaintiffs'

Counsel the Fee and Expense Amount of $450,000 (subject to Court approval). As discussed below, the Fee and Expense Amount is eminently reasonable in light of the substantial benefits provided for in the Settlement and is exceedingly modest relative to fee awards approved in comparable derivative settlements. A lodestar cross-check confirms the agreed amount will not confer any windfall to Plaintiffs' Counsel's efforts as the requested amount is far less than the collective lodestar of Plaintiffs' Counsel.

AEP disseminated the Notice in the manner approved by the Court as meeting Rule 23.1 and due process standards. To date, no objections have been filed or received by counsel, indicating support for the proposed Settlement among AEP's stockholders.

For these reasons, Plaintiffs respectfully submit that the Settlement should be approved in all respects, and the proposed Judgment entered by the Court.

## II.    SUMMARY OF ALLEGATIONS AND PROCEDURAL HISTORY

### A.    This Action

On August 25, 2020, plaintiff Reese served a pre-suit document inspection demand on AEP pursuant to N.Y. B.C.L. § 624, seeking to inspect certain AEP documents. After negotiation with counsel for AEP, and execution of a confidentiality agreement, an initial document production was made to plaintiff Reese that was further supplemented on March 25, 2021.

On January 15, 2021, Esther Kogus[3] filed a verified derivative complaint in the Ohio Federal Court pleading claims for breach of fiduciary duty and unjust enrichment. Plaintiff Reese filed an action in Ohio Federal Court on April 7, 2021 pleading multiple claims for breach of

---

[3]    Ms. Kogus, one of the two stockholders in the Ohio Federal Action, died during the pendency of the litigation. Neither Ms. Kogus nor her estate appealed the Ohio Federal Court's order dismissing the Ohio Federal Action with prejudice. Nonetheless, for the avoidance of doubt, all derivative claims pursued by Ms. Kogus or her estate on behalf of AEP will be dismissed, released, and barred pursuant to the terms of the Settlement.

fiduciary duty and contribution for violation of Sections 10(b) and 21D of the Securities Exchange Act of 1934.

On June 3, 2021, the plaintiffs in the Ohio Federal Action agreed to consolidate the two actions pending in Ohio Federal Court and organize counsel. The Order consolidating the actions and appointing co-lead counsel was entered on June 9, 2021.

On March 22, 2022, the plaintiffs in the Ohio Federal Action filed a consolidated Amended Verified Shareholder Derivative Complaint (the "Amended Complaint") pleading four claims, including breach of fiduciary duty, waste, unjust enrichment, and breach of fiduciary duty for insider trading.

The Amended Complaint alleges (among other things) that AEP, at the direction and/or with the acquiescence of certain of its officers and directors, sought an illegal legislative solution to its long-standing troubles with its nuclear generation operations—namely, a three-year long series of illegal secret payments to a 501(c)(4) corporation controlled by former Ohio House Speaker Householder totaling hundreds of thousands of dollars in an effort to enact Ohio's HB 6, which would secure a $1.3 billion bailout of two struggling coal-fired power plants that AEP owned through the Ohio Valley Electric Corporation ("OVEC"). Defendant Nicholas K. Akins ("Akins") would ultimately acknowledge that AEP had made $8.7 million in dark money contributions to its 501(c)(4) non-profit Empowering Ohio's Economy ("EOE"), which then funneled $900,000 in secret political contributions to Generation Now and Coalition for Growth & Opportunity ("Coalition")—the entities that Householder used in the bribery scheme to ensure passage of HB6. Plaintiffs allege that the Individual Defendants either knew or had reason to know of the continuing illegal bribery scheme funded by AEP's donations to Generation Now and Coalition.

On May 3, 2022, the Individual Defendants and AEP filed a motion to dismiss the Amended Complaint, which was opposed by the plaintiffs on May 24, 2022. After a hearing conducted on March 17, 2023, the Ohio Federal Court entered an order dismissing with prejudice the Ohio Federal Action on March 21, 2023 and entered judgment the same day.

Neither Ms. Kogus nor her estate appealed the Ohio Federal Court's order dismissing the Ohio Federal Action with prejudice and the dismissal order is final as to her.

On April 21, 2023, plaintiff Reese ("Appellant") filed a Notice of Appeal of the Ohio Federal Court's order granting the Individual Defendants' and AEP's Motion to Dismiss (the "Appeal").

**B.      The Ohio State Action**

On February 9, 2021, plaintiff Darryl Jones initiated the Ohio State Action alleging claims for breach of fiduciary duty, waste, and unjust enrichment. On March 18, 2021, and again on February 23, 2022, the parties stipulated to a temporary stay of the Ohio State Action. On June 2, 2022, plaintiff Jones filed an Amended Complaint. The stay was extended—over plaintiff Jones' objection—by the Ohio State Court on June 15, 2022 and remains in effect.

**C.      The New York State Action and Litigation Demand**

On November 9, 2020, plaintiff Speiser served a pre-suit document demand on AEP pursuant to N.Y.B.C.L. § 624. After negotiation with counsel for AEP and execution of a confidentiality agreement, an initial document production was made to plaintiff Speiser on December 16, 2020, which was supplemented several times over the next few months.

On April 27, 2021, plaintiff Speiser commenced the New York State Action in New York state court and filed a complaint on May 12, 2021 alleging claims for breach of fiduciary duty, unjust enrichment, and waste.

On September 13, 2022, the New York State court dismissed with prejudice the New York State Action under C.P.L.R. § 3211(a)(4) because the complaint's claims arose out of the same subject matter as the prior pending Ohio Federal Action. On January 20, 2023, plaintiff Speiser sought to intervene in the Ohio Federal Action, which was denied by the Ohio Federal Court on March 21, 2023.

On April 26, 2023, plaintiff Speiser sent the Litigation Demand to the Board of AEP demanding, among other things, that the Board investigate and pursue potential claims as described therein.

On May 2, 2023, the AEP Board of Directors appointed a committee of the Board, the Demand Review Committee ("DRC"), to investigate the Litigation Demand and exercise all such other powers delegated to the DRC by the AEP Board. On May 22, 2023, the AEP Board sent a letter advising plaintiff Speiser of the formation of the DRC and that the DRC was in the process of undertaking its work.

The DRC subsequently retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("DRC Counsel") to advise the DRC in connection with its work, which included DRC Counsel advising the DRC in connection with its recommendation to the AEP Board concerning this Settlement.

### D.    Settlement Efforts

On May 8, 2023, the Appeal was referred to the Mediator, to consider whether a negotiated resolution of the Appeal could be agreed upon. Over the next six months, counsel for the Appellant and Appellee engaged in protracted negotiations, with the assistance of the Mediator.

On July 6, 2023, Plaintiffs made a global settlement demand to resolve the Derivative Actions and the Litigation Demand. Thereafter, the Settling Parties exchanged multiple draft proposals and reached an agreement on November 14, 2023 on certain key terms to resolve all

7

pending Derivative Actions and the Litigation Demand, which was subject to an agreement on final documentation and any necessary court approval.

In connection with discussions and negotiations leading to the proposed Settlement, counsel for the Settling Parties did not discuss the amount of any application by Plaintiffs' Counsel for an award of attorneys' fees and expenses until the substantive terms of the Settlement were negotiated at arm's-length and agreed upon. Thereafter, with the assistance of the Mediator, the Settling Parties agreed on payment to Plaintiffs' Counsel for attorneys' fees and expenses in the amount of $450,000.00, subject to agreement on final documentation and any necessary court approval.

The Settlement reflects the final and binding agreement among the Settling Parties.

### E.     Preliminary Approval and Notice to Current Stockholders

On July 10, 2924, the Court granted preliminary approval of the Settlement and approved the proposed notice program as consistent with legal requirements and due process. ECF No. 617. Notice was timely disseminated in accordance with the Court's Preliminary Approval Order. To date, counsel have received no objections from Current Stockholders. Houston Decl., ¶ 42.

## III.     THE CORPORATE GOVERNANCE REFORMS

In consideration for the Settlement, the Company has agreed to implement and maintain for a minimum of five (5) years the following corporate governance Reforms (which are set forth in Exhibit A to the Settlement):

1.     The Committee on Directors and Corporate Governance shall have oversight over political engagement activities conducted by AEP, as described specifically in AEP's Political Engagement Policy. Any political contributions or expenditures shall reflect the interests of the Company, as an entity, and not those of its individual officers or directors. Any such contributions or expenditures shall be in compliance with applicable laws, rules and regulations as in effect from time to time.

2.     The Company has created the title of "Chief Compliance Officer—Political Engagement" who is the representative within the AEP legal department designated

by AEP's Chief Compliance Officer to review and approve requests subject to AEP's Political Engagement Policy. That position and those duties shall be specified in AEP's Political Engagement Policy as published on the Company's website.

3.      As explained more fully in Exhibit A to the Settlement, beginning in 2024, the Company shall, at least semi-annually, post on the Company's website a report that reflects the Company's use of corporate funds for political contributions or expenditures or for payments to certain tax-exempt organizations that the Company understands may use such payments for political or lobbying activities ("Political Engagement Report").[4] Each Political Engagement Report will be reviewed by the management-level Disclosure Committee or a subcommittee thereof and the Chief Compliance Officer responsible for political engagement and will be available on AEP's website for at least five years before it is removed.

4.      In accordance with its Political Engagement Policy, AEP shall disclose publicly the titles of positions at AEP that have the authority to approve contributions or expenditures that are included within the scope of Section 3, above, and as explained more fully in Exhibit A to the Settlement.

5.      The Corporate Governance Committee shall, at least twice per year, review a summary of all contributions or expenditures made by AEP that are included within the scope of Section 3, above.

6.      AEP's Speak Up Policy shall be posted in a conspicuous place on AEP's website.

7.      The Corporate Governance Committee charter shall be amended to include reports to the Corporate Governance Committee, twice a year, by the Chief Compliance Officer on the AEP Compliance Program.

8.      AEP shall amend the charter of the management-level Disclosure Committee, which charter shall set forth the enhanced duties and responsibilities of that Committee (Ex. A1). The charter shall be approved by senior management and ratified by the Audit Committee of the AEP Board. A copy of the amended charter is included as Exhibit A1 to the Settlement.

9.      AEP has adopted the Ethics & Compliance Program Charter (included as Ex. A2 to the Settlement).

10.     Any contribution made by the Company without authorization by the appropriate person(s) pursuant to the Political Engagement Policy shall be promptly reported

---

[4]      The Political Engagement Report shall address, among other things: AEP's policies for making, with corporate funds or assets, political contributions and expenditures, as well as a summary of AEP's monetary and non-monetary political contributions and expenditures, nondeductible membership dues paid to trade associations, and contributions or payments of $5,000 or more made to 501(c)(4) social welfare organizations.

to the Corporate Governance Committee.

11. Each member of the Board shall annually participate in continuing education: (1) designed for directors of publicly traded companies; (2) addressing risks, public policy or industry-wide issues, or governance items relevant to the Company; or (3) that otherwise enhances their performance as a director of the Company.

12. Annual training on the AEP Principles of Business Conduct shall be mandatory for all officers and employees of AEP. In the event a person is appointed or hired after the annual training for a particular year, training shall be completed for such individual within 90 days.

AEP acknowledges that: "(a) Plaintiffs' litigation and settlement efforts were a substantial and material cause of the Company's decision to adopt, implement, and maintain the Reforms; (b) the Reforms confer a substantial benefit upon the Company and its Current Stockholders; and (c) the Settlement is fair, adequate, reasonable, and in the best interests of the Company and its Current Stockholders." Settlement ¶ 3.

## IV. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE FINALLY APPROVED

### A. Applicable Standard

Fed. R. Civ. P. 23.1 governs a district court's analysis of the fairness of a settlement of a stockholder derivative action. Under Rule 23.1, a derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval. Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1(c). The strong federal policy favoring compromises that resolve litigation is even stronger in complex cases where substantial judicial resources can be conserved by avoiding formal litigation. *In re Se. Milk Antitrust Litig.*, No. 2:08-MD-1000, 2009 WL 3747130, at *3 (E.D. Tenn. Nov. 3, 2009). "Settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'" *Granada Invs., Inc. v. DWG Corp.*, No. 1:89CV0641, 1991 WL 338233, at *6 (N.D. Ohio Feb. 12, 1991).

Courts routinely recognize that derivative settlements providing non-monetary benefits (such as material changes to corporate governance and compliance) provide the real-party-in-interest, the corporation, with substantial benefits that warrant judicial approval.  In *Granada Investments*, the U.S. Court of Appeals for the Sixth Circuit, while affirming the district court's final approval of a settlement comprised of corporate governance reforms, recognized that "it is not far-fetched to consider governance changes ... as genuinely beneficial." *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1206 (6th Cir. 1992); *see also, e.g.*, *City of Plantation Police Officers' Emps.' Ret. Sys. v. Jeffries*, No. 2:14-cv-1380, 2014 WL 7404000, at *6 (S.D. Ohio Dec. 30, 2014) (finally approving derivative settlement solely providing corporate governance reforms and finding that proposed settlement conferred a substantial benefit upon the company and its stockholders).

When evaluating a proposed stockholder derivative settlement, "'courts have borrowed from the law governing class actions under Rule 23.'" *Regions Morgan*, 2015 WL 11145134, at *2 (quoting *City of Plantation*, 2014 WL 7404000, at *5).  In doing so, "[t]he pertinent inquiry is whether the proposed settlement is 'fair, reasonable, and adequate.'" *Regions Morgan*, 2015 WL 11145134, at *2 (quoting Fed. R. Civ. P. 23(e)(2)).  In determining whether a settlement warrants final approval, the Court considers seven factors: "'(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinion of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.'" *Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*, 636 F.3d 235, 244 (6th Cir. 2011) (quoting *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)).  "In considering these factors, the task of the court 'is not to decide whether one side is right or even whether one side has the better of

these arguments.... The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement.'" *Gascho v. Glob. Fitness Holdings, LLC*, No. 2:11-cv-436, 2014 WL 1350509, at *16 (S.D. Ohio Apr. 4, 2014) (quoting *UAW*, 497 F.3d at 632) (omission in original). Moreover, the court "enjoys wide discretion in assessing the weight and applicability of these factors." *Granada Invs.*, 962 F.2d at 1205–06.[5] As set forth herein, the Settling Parties' extensive, both the Mediator-facilitated negotiations and the actual Reforms achieved warrant final approval of the Settlement.

### B. The Settlement Satisfies the Criteria for Final Approval

The Settlement should be finally approved because it provides substantial benefits to AEP and current AEP stockholders, was negotiated at arm's-length with the assistance of the Mediator by the parties after an informed investigation, and appropriately balances the risks of litigation against the benefits of settlement.

### 1. The Settlement Merits the Presumption of Fairness Because It Is the Product of Arm's-Length Negotiations Between Experienced and Well-Informed Adversaries

Where "the [c]ourt finds that the [s]ettlement is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex ... litigation, the [s]ettlement will enjoy a presumption of fairness." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173–74 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001); *Villanueva v. Morpho Detection, Inc.*, No. 13–cv–05390–HSG, 2015 WL 4760464, at *6 (N.D. Cal. Aug. 12, 2015) (settlement enjoys a presumption of fairness if it "is recommended by ... counsel after arm's-length bargaining"); *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08

---

[5]     In the interest of brevity, and to avoid unnecessary repetition, Plaintiffs combine the discussion of certain of these factors, where appropriate.

1365 CW EMC, 2010 WL 1687832, at *13 (N.D. Cal. Apr. 22, 2010) (where "a settlement is the product of arms-length negotiations conducted by capable and experienced counsel, the court begins its analysis with a presumption that the settlement is fair and reasonable"); *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 501 (E.D. Mich. 2008) ("[w]ithout evidence to the contrary, the court may presume that settlement negotiations were conducted in good faith and that the resulting agreements were reached without collusion"). Accordingly, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties … must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982); *see UAW*, 497 F.3d at 632 ("Our task is not to decide whether one side is right or even whether one side has the better of these arguments. Otherwise, we would be compelled to defeat the purpose of a settlement in order to approve a settlement. The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement.").

Here, the Settlement was agreed to after extensive arm's-length negotiations among counsel for the Settling Parties. The negotiations also involved multiple sessions with the Mediator. This factor therefore weighs in favor of final approval of the proposed Settlement.

The Settlement is also the result of many months of hard-fought, arm's-length negotiations among experienced, well-informed counsel following their substantial investigation of the claims, defenses and remedial measures, with the assistance of a highly regarded neutral. The settlement negotiations included settlement demands, exchanging counterproposals, and multiple follow up negotiations. Plaintiffs' Counsel include nationally recognized leaders in stockholder litigation.

*See* Houston Decl., ¶ 53 & Exs. B-H.  AEP, the Individual Defendants, and the DRC were represented by preeminent corporate defense counsel.

Plaintiffs' Counsel recommendation in favor of the Settlement is well-informed both by facts gathered and evaluated in their investigation, and the crucible of an extended and rigorous mediation process, which tested the relative strength of the claims, theories of liability, estimates of damages, and the available defenses.  Houston Decl., ¶¶ 54-57.  Indeed, Plaintiffs entered into the settlement discussions "fully apprised about the legal and factual issues presented as well as the strengths and weaknesses of their cases" and are able to make "a well-informed decision to enter into the proposed Settlement agreement."  *In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 374-75 (S.D. Ohio 2006).  Plaintiffs' Counsel's extensive investigation and analysis, included, *inter alia*: (i) obtaining and reviewing relevant internal books and records of AEP produced in response to an inspection demand made pursuant to N.Y. B.C.L. § 624; (ii) review of AEP's press releases, recorded public statements, U.S. Securities and Exchange Commission ("SEC") filings, and securities analysts' reports and advisories about the Company; (iii) review of relevant business and media reports about the Company; (iv) review and analysis of the filings and pleadings in the related Securities Action; (v) factual and legal research and analysis conducted in preparing the derivative complaints; (vi) compilation and analysis of data bearing on potential damages and board and executive compensation potentially subject to disgorgement or clawback; (vii) additional factual and legal research and analysis performed in connection with the Plaintiffs' settlement negotiation, including detailed assessments of each claim and potential defenses, research into corporate governance and oversight best practices generally and among AEP's peer corporations; and (viii) review and analysis of information and documents exchanged with AEP and the Individual Defendants during the course of settlement negotiations.  *See* Settlement at 2,

6-7. In these circumstances, the opinion of counsel is entitled to deference. *Williams v. Vukovich*, 720 F.2d 909, 922–23 (6th Cir. 1983); *Johnson v. City of Tulsa*, No. 94–CV–39–H(M), 2003 WL 24015151, at *11 (N.D. Okla. May 12, 2003), *aff'd sub nom. Johnson v. Lodge #93 of Fraternal Ord. of Police*, 393 F.3d 1096 (10th Cir. 2004); *Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 501 (E.D. Mich. 2000); *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 151 n.7 (S.D. Ohio 1992).

The Mediator's involvement in negotiating the Settlement (and, separately, the agreed Fee and Expense Amount) confirms the arm's-length nature of the settlement negotiations, and the Mediator's participation eliminates any concerns about collusion. *See Hainey v. Parrott*, 617 F. Supp. 2d 668, 673 (S.D. Ohio 2007) ("[t]he participation of an independent mediator in the settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties"); *Arledge v. Domino's Pizza, Inc*., No. 3:16-cv-386-WHR, 2018 U.S. Dist. LEXIS 179474, at *5 (S.D. Ohio Oct. 17, 2018); *D'Amato*, 236 F.3d at 85 ("mediator's involvement … helps to ensure that the proceedings were free of collusion"); *NVIDIA*, No. C-06-06110-SBA(JCS), 2009 U.S. Dist. LEXIS 24973, at *10-11 (N.D. Cal. Mar. 18, 2009) (approving settlement where "the parties engaged in significant negotiations, including at least four formal mediation sessions, and the parties were assisted by an experienced mediator in reaching the Settlement," which "weighs considerably against any inference of a collusive settlement."); *Satchell v. Fed. Express Corp*., No. C03-2659 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.").

In addition, courts traditionally give substantial deference to directors' exercise of independent business judgment. *See generally Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981); *see also Brooks v. Am. Exp. Indus., Inc*., 71 Civ. 5128**,** 1977 U.S. Dist. LEXIS 17313,

at *10 (S.D.N.Y. Feb. 17, 1977) ("The Court is of the view that in this case, the decision of the []
board to approve this settlement is appropriately afforded certain deference; it is a business
judgment with presumptive validity."). Here, AEP and its Board have approved the Settlement
and acknowledged and agreed that the Settlement confers substantial benefits upon AEP and its
stockholders, further supporting final Settlement approval.

Finally, as provided in the Settlement, the parties did not begin negotiating the Fee and
Expense Amount until after all the substantive terms of the Settlement were agreed upon.
Settlement ¶ 13. This factor further demonstrates the fairness of the arm's-length Settlement
because "the amount of attorneys' fees could not have affected the amount of [p]laintiffs'
recovery." *In re Chickie's & Pete's Wage & Hour Litig.*, No. 12–6820, 2014 WL 911718, at *4
(E.D. Pa. Mar. 7, 2014).

### 2. The Settlement Confers Substantial Benefits on AEP

"The 'principle factor' to be considered in a proposed [derivative] settlement 'is the extent
of the benefit to be derived from the proposed settlement by the corporation, the real party in
interest.'" *City of Plantation*, 2014 WL 7404000, at *5. The Reforms that AEP has agreed to
implement and maintain in connection with the Settlement confer substantial benefits on the
Company and its stockholders.

The Settlement provides AEP and its stockholders with the benefits of a robust set of
policy, governance, internal controls, and oversight enhancements designed to address the specific
alleged policy, decision-making, and oversight lapses that permitted the alleged illegal bribery
scheme to occur. The Reforms are designed to substantially reduce the likelihood that the
Company will suffer the significant harm that would attend a recurrence of the alleged
wrongdoing, help improve decision-making and oversight at the Company, and lay the foundation
necessary for improving the AEP's reputation and investor confidence in the Company. The

Reforms confer real and substantial economic value upon AEP and its stockholders that almost certainly exceeds the probable range of recovery at trial, particularly when discounted for the enormous risk, costs, delays, and disruption further litigation in pursuit of such a recovery would entail.

"[A] corporation may receive a 'substantial benefit' from a derivative suit … regardless of whether the benefit is pecuniary in nature." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970); *Lewis v. Anderson*, 692 F.2d 1267, 1271 (9th Cir. 1982) (citing *Fletcher v. A. J. Indus., Inc.*, 266 Cal. App. 2d 313, 324 (1968) (approving settlement predicated upon non-pecuniary benefit)).

Although difficult to quantify in precise monetary terms, courts widely recognize the substantial economic value of corporate governance reforms tailored to address the oversight and controls lapses alleged in the Derivative Actions and the Demand. *See Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005) ("Courts have recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies."); *In re AOL Time Warner S'holder Derivative Litig.*, No. 02 CIV. 6302(SWK), 2006 WL 2572114, at *4 (S.D.N.Y. Sept. 6, 2006) (benefit of prophylaxis can be "substantial enough to merit approval"). Among other benefits, such reforms make it "far less likely [that the corporation will] become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators and prosecutors." *Cohn*, 375 F. Supp. 2d at 853; *see also Mills*, 396 U.S. at 396 (substantial benefit conferred where the relief "accomplishes a result which corrects or prevents an abuse which would be prejudicial to the rights and interests of the corporation or affect the enjoyment or protection of an essential right to the stockholder's interest"); *In re Pfizer Inc., S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 342 (S.D.N.Y. 2011) (approving settlement providing for "a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have, in recent years, caused extensive harm

17

to the company"); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3rd Cir. 1993) (approving derivative settlement mandating structural changes in corporate governance and stating "nonpecuniary benefits to the corporation may support a settlement"); *Granada Invs*, 962 F.2d. at 1207 (settlement of derivative action approved where defendants agreed to changes in corporate governance).

In fact, in many circumstances, the economic value of strong prophylactic reforms far outweighs any likely monetary recovery. *See Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983) ("the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor"); *Cohn*, 375 F. Supp. 2d at 853 (corporate governance reforms "achieved independently of any monetary benefits … are even more worthwhile").

Here, the Reforms—a significant and comprehensive collection of corporate governance and internal control improvements—are designed to mitigate the risk of a recurrence of the issues alleged to have resulted in harm to the Company here. Plaintiffs' allege AEP illegally contributed funds to a 501(c)(4) social welfare organization (Empowering Ohio's Economy) that, in turn, contributed to a 501(c)(4) organization (Generation Now) that was controlled by former Ohio Speaker Householder, who spearheaded passage of Ohio's House Bill 6, which secured $1.3 billion in subsidies for two coal-fired plants owned, in part, by AEP. The Reforms will significantly strengthen the Company's internal controls by directly addressing the Company's control weaknesses and lapses alleged in the Derivative Actions and the Demand. Among other things, the Reforms provide for (i) enhanced oversight of political engagement activities conducted by the Company; (ii) the creation of the new position of Chief Compliance Officer—Political Engagement with responsibility for reviewing and approving requests subject to AEP's Political Engagement Policy; (iii) a requirement that the Company publish on its website, at least semi-

annually, a Political Engagement Report reflecting the Company's use of corporate funds for political contributions or expenditures or for payments to certain tax-exempt organizations that may use such payments for political or lobbying activities; (iv) enhanced disclosure requirements concerning the individuals at the Company with responsibility for approving such contributions and/or expenditures; (v) amendments to the charter of the management-level Disclosure Committee reflecting its enhanced duties and responsibilities concerning the Company's public disclosures; (vi) the adoption of a new Ethics & Compliance Program Charter; and (vii) enhanced director, officer, and employee training and education. *See* Settlement, Ex. A.

The Reforms are designed to deliver real, lasting, and substantial economic value far greater than any likely monetary award that might be obtained through further litigation.

*First*, by materially improving the Company's internal controls and oversight concerning political engagement activities, related public disclosures, legal and regulatory compliance, and other business practices, the Reforms substantially reduce the likelihood that the alleged oversight and disclosure failures will recur and that AEP and its stockholders will suffer the potential loss of investor confidence and legal and/or regulatory exposure as a result of similar allegations in the future.[6]

*Second*, more rigorous, independent and effective oversight will improve corporate decision-making and execution of key corporate strategies; improve the Company's business prospects; ensure accurate disclosures to investors and the public at large; and reduce the costs

---

[6] While the value of preventing future alleged missteps cannot be estimated with precision, the market's swift and dramatic discount of AEP's market capitalization when the alleged truth was revealed in this case—as well as the significant harm the Company would suffer if faced with another similar scandal in the near term—suggests value potentially ranging at least into the tens of millions of dollars.

associated with failure to comply with disclosure and other legal and/or regulatory requirements.[7]

*Third*, the Reforms confer economic value by laying the foundation necessary to enhance investor confidence in the Company's legal and regulatory compliance, the accuracy of its public disclosures, the integrity of its management, and the effectiveness of the Company's corporate governance and Board oversight.[8]

When investors pay a premium for stock in well-governed corporations, their market capitalization increases and long-term stockholder value is enhanced.  Studies using various statistical approaches confirm this dynamic.  *See* Houston Decl., Ex. J, P. Gompers, J. Ishii & A. Metrick, *Corporate Governance and Equity Prices*, 118 Quarterly J. Econ. (2003); *id.*, Ex. K Lawrence D. Brown & Marcus L. Caylor, *The Correlation between Corporate Governance and Company Performance, Institutional Shareholder Services* (2004); *id.*, Ex. L (V. Cunant, M. Gina & M. Guadalupe, *The Vote Is Cast: The Effect of Corporate Governance on Shareholder Value*, 67 J. Finance 68 (Oct. 2012)).  McKinsey & Company sought to quantify this effect in a survey of more than 200 large institutional investors with over $3.25 trillion under management.  *See id.*, Ex. M (*McKinsey & Company Investor Opinion Survey*, McKinsey & Company (June 2000)).  Respondents were asked to consider investments in two companies, both of which had performed

---

[7]     While it would be difficult to estimate the value of these benefits precisely, they are no less real and substantial.  Put simply, rigorous oversight enabled by well-developed, dedicated board structures and strong information, monitoring and reporting regimes produces materially better outcomes for corporations and their stockholders.

[8]     Research by academics and leading business advisors confirms what directors of leading corporations and institutional investors know from experience:  Investors pay a premium for stock in companies with strong corporate governance relative to peer companies perceived to have weaker governance because strong governance correlates with long-term value creation.  *See* Houston Decl., Ex. I (Bebchuk & Hamdani, *The Elusive Quest for Global Governance Standards*, 157 U. Pa. L. Rev. 1263, 1266 (May 2009) ("There is now widespread [acceptance] that adequate investor protection can substantially affect not only the value of public firms and their performance but also the development of capital markets and the growth of the economy as a whole.")).

well in the past but had run into trouble. Across a number of attributes, one company had strong governance; the other did not. Seventy-five percent of those responding ranked governance attributes as more important than financial issues, and eighty percent said they would pay substantially more for the company with strong governance. The U.S. respondents were willing to pay an average premium of 18.3%. Based on these results, McKinsey & Company concluded:

> Although it remains difficult to measure the impact on market prices of the premium investors say they are willing to pay for well-governed companies, the amounts they are prepared to pay leave little doubt that good governance does feed through…. If companies could capture but a small portion of the governance premium that is apparently available, they would create significant shareholder value.

*See id.*

The Reforms address many of the attributes investors recognize as important to strong governance and provide a comprehensive and effective remedial response to the allegations in the Derivative Actions and the Demand. AEP's current market capitalization is approximately $54 billion. Even if the Reforms' precise value cannot be estimated, conservatively assuming the Reforms would unlock a premium of just 1% (the average premium reported in the McKinsey & Company survey was 18.4%) suggests a value well into the tens of millions of dollars, over and above the value of preventing recurrence of the alleged harm and improving corporate decision-making and risk management, overall.

AEP has agreed to maintain all of these governance measures for a minimum of five (5) years—a meaningful amount of time that will ensure the Reforms become embedded in the Company's policies, practices, and culture, thus protecting against discontinuation of these Reforms following the five-year period. Settlement, Ex. A; *see Cohn*, 375 F. Supp. 2d at 850 (corporate governance measures that must be in place for no less than three years will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past").

21

The Reforms far outweigh the speculative potential of any monetary recovery and support final approval of the Settlement. *See In re Intel Corp. Derivative Litig.*, No. 09–867–JJF, 2010 WL 2955178, at *2 (D. Del. July 22, 2010) ("the [c]ourt finds that the corporate governance reforms initiated by [the company] as a result of the parties' negotiations and this [s]ettlement have value to both the [c]ompany and its shareholders both currently and in the long-term, and that these benefits outweigh the speculative potential of any monetary payment from the relevant insurance policies").

### 3. The Settlement Appropriately Balances the Significant Risks and Expense of Continued Litigation with the Benefits Conferred Upon AEP and Current Stockholders

The uncertainties of further litigating the Derivative Actions further weigh in favor of the final approval of the Settlement. Although Plaintiffs believe the derivative claims are meritorious, there exist significant risks in continuing to prosecute the Derivative Actions, including the possibility that Plaintiffs would not be able to recover *anything* for the benefit of AEP. *See In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (affirming approval of derivative settlement and noting that "the odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful"); *Maher*, 714 F.2d at 455 ("Settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable'").

First, under New York law (where AEP is incorporated), to have standing to pursue this stockholder derivative action on behalf of AEP, Plaintiffs had to allege, with particularized facts, that a pre-suit demand on the Board would have been futile—*i.e.*, that: (1) a majority of the board is interested in the challenged transaction, either because of direct self-interest or loss of independence to another director who is self-interested; (2) the board did not fully inform themselves about the challenged transaction, in light of the "long standing rule" that a director

"does not exempt himself from liability by failing to do more than passively rubber-stamp the decisions of the active managers"; or (3) the challenged transaction was so egregious on its face that it could not have been the product of sound business judgment. *Marx v. Akers*, 88 N.Y.2d 189, 200-01 (1996).

Despite Plaintiffs believing they had alleged particularized facts to establish demand futility, the Court disagreed and granted the Defendants' motion to dismiss. Plaintiff Reese filed a notice of appeal and believes the appeal has merit, but Plaintiff Reese would face an uphill battle in convincing the appellate court to reverse this Court's decision on the motion to dismiss. If plaintiff Reese were unsuccessful in securing a reversal of the dismissal on appeal, he would then have to make a demand on the Board to commence an investigation and pursue litigation against the alleged wrongdoers. But a litigation demand would present its own set of hurdles and risks, and it would require the Company to expend significant time and resources to investigate dated claims against many individuals who are no longer with the Company.

In the event plaintiff Reese prevailed in getting the dismissal order reversed on appeal, he would still face numerous and substantial hurdles. For example, under New York law, even a conflicted board upon whom demand has been deemed futile can wrest control of a derivative claim from a stockholder by establishing a special litigation committee of independent directors. *See Auerbach v. Bennett*, 47 N.Y.2d 619, 633-35 (1979). If a special litigation committee determined that it was not in AEP's best interest to pursue the claims at issue, it could seek to terminate this case following an investigation. *Id*.

Even if Plaintiffs were to get past the pleading stage, significant questions would remain about whether Plaintiffs could secure evidence sufficient to overcome motions for summary judgment predicated on the "business judgment rule," which affords directors the presumption that

they acted on an informed basis and in the good faith belief that the actions taken were in the best interest of the company,[9] and applicable exculpation and indemnification rights granted to directors. The claims against all of the Defendants likely would rest on circumstantial evidence, and the claims against the outside directors, in particular, center on alleged oversight failures that are notoriously difficult to recover for. Discovery required to bring this derivative case to trial would be exceedingly costly, complex, and time-consuming, as it would encompass an enormous volume of additional documents, depositions of myriad fact witnesses relevant to the derivative claims, and preparation of expert reports and depositions concerning subjects unique to this derivative litigation.

Even if liability were established, the amount of recoverable damages would still have posed significant issues and would have been subject to further litigation. *See Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 76 (D. Mass. 1999) *enforcement granted*, No. CIV.A. 97-40204-NMG, 2006 WL 8201933 (D. Mass. Sept. 19, 2006) (approving settlement where plaintiffs faced several significant, viable legal defenses "any one of which, if successful, could result in entry of a judgment *with prejudice* against the [c]lass.") (emphasis in original); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 68 (D. Mass. 1997) (same).

Further, even if Plaintiffs were able to prevail and obtain any judgment(s) at trial(s), Defendants would almost certainly appeal any such verdict(s) and the award(s). This process would likely take several years, prolonging the implementation of any corporate governance benefits at the Company. *See Broadwing*, 252 F.R.D. at 373-74 (explaining "the difficulty

---

[9] The business judgment rule "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Auerbach*, 47 N.Y.2d at 621. That is, "by definition the responsibility for business judgments must rest with the corporate directors .... [and] absent evidence of bad faith or fraud ... the courts must and properly should respect their determinations." *Id.* at 630–31.

[p]laintiffs would encounter in proving their claims, the substantial litigation expenses, and a possible delay in recovery due to the appellate process, provide justifications for this [c]ourt's approval of the proposed [s]ettlement"). An appeal of any verdict would carry the risk of reversal, jeopardizing the entire recovery even if Plaintiffs prevailed at trial. *See, e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc*., 787 F.3d 408 (7th Cir. 2015) (vacating in part $2.46 billion judgment against securities fraud defendants and remanding for a new trial on limited issues—after thirteen years of litigation); *Anixter v. Home- Stake Prod. Co*., 77 F.3d 1215, 1233 (10th Cir. 1996) (overturning securities fraud class action jury verdict for plaintiffs after over twenty years of litigation).

In addition to the risks of successfully establishing liability and damages, the Court should balance the immediacy and certainty of a substantial recovery against the "the complexity, expense, and likely duration of the litigation." *Levell v. Monsanto Rsch. Corp.*, 191 F.R.D. 543, 550 (S.D. Ohio 2020); *Williams*, 720 F.2d at 922–24.

The proposed Settlement eliminates these and other risks of continued litigation, including the very real risk of no recovery after several more years of litigation, while providing AEP with substantial benefits immediately. *See, e.g.*, *Maher*, 714 F.2d at 466 (derivative settlement approved where "the parties' conclusion that any possible benefit to [the company] from pursuing the causes of action would be more than offset by the additional cost of litigation was based on an intelligent and prudent evaluation of their case").

### 4. The Reaction of Stockholders to the Settlement Supports Final Approval of the Settlement

Courts also consider the reaction of the affected stockholders. *Brotherton v. Cleveland*, 141 F. Supp. 2d 894, 906 (S.D. Ohio 2001). "The lack of objections by class members in relation to the size of the class also highlights the fairness of the settlements to unnamed class members

and supports approval of the settlements." *In re Se. Milk Antitrust Litig.*, No. 2:07-CV-208, 2012 WL 2236692, at *4 (E.D. Tenn. June 15, 20212).  Even if some stockholder ultimately objects, "[t]he fact that some class members object to the [s]ettlement does not by itself prevent the court from approving the agreement." *Brotherton*, 141 F. Supp. 2d at 906; *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 533 (E.D. Ky. 2010) ("'A certain number of ... objections are to be expected in a class action[.]'") (omission in original).  Nevertheless, "a relatively small number of class members who object is an indication of a settlement's fairness." *Brotherton*, 141 F. Supp. 2d at 906 (citing 2 Herbert Newberg & Alba Conte, *Newberg on Class Actions*, §11.48 (3d ed. 1992)).

In its July 10, 2024 Preliminary Approval Order, the Court approved both the form and manner of Notice.  ECF No. 57.  Specifically, pursuant to the Preliminary Approval Order, AEP: (i) caused a copy of the Notice and the Settlement to be posted on the Company's "Investor Relations" webpage; (ii) filed with the SEC a Form 8-K acknowledging the Settlement, directing investors to the Company's "Investor Relations" webpage, and including the Notice as an exhibit; and (iii) caused a copy of the Summary Notice to be published once in *Investor's Business Daily*. *See* Declaration of David C. House, ¶¶3-5 (filed Aug. 13, 2024; ECF No. 62).  The Notice and Summary Notice provided a detailed history of the Derivative Actions, the Settlement, disclosed the time and location of the Settlement Hearing, the Fee and Expense Amount and the service awards, and advised Current Stockholders of the procedures for objecting to the proposed Settlement.  While the deadline for objections has not yet passed, to date, no Current Stockholder has objected to the Settlement or any of its terms.  Houston Decl., ¶ 42.[10]

---

[10]  Any stockholder comments received before the September 19, 2024 objection deadline passes will be addressed in the reply papers due by September 26, 2024.

### 5.    The Public Interest Favors Approval of the Settlement

"'[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources.'" *Hyland v. HomeServices of Am., Inc*., No. 3:05-CV-612-R, 2012 WL 1575310, at *7 (W.D. Ky. May 3, 2012); *see also Granada Invs*., 1991 WL 338233, at *6 (same).  As discussed above, the Settlement is an excellent result for AEP in derivative litigation of substantial complexity and cost.  As a result of the Settlement, AEP will implement the extensive Reforms designed to address the alleged internal control and disclosure issues that gave rise to the Derivative Actions and the Demand.  This factor further weighs in favor of Settlement approval here.  *See Broadwing*, 252 F.R.D. at 376 ("[T]here is certainly a public interest in settlement of disputed cases that require substantial federal judicial resources to supervise and resolve.").

## V.    THE SEPARATELY NEGOTIATED FEE AND EXPENSE AMOUNT IS FAIR AND REASONABLE AND SHOULD BE APPROVED

### A.    The Parties' Agreement Is the Product of Arm's-Length Negotiations

The U.S. Supreme Court has endorsed the consensual resolution of the amount of attorneys' fees to be paid to plaintiffs' counsel in representative litigation.  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation.  Ideally ... litigants will settle the amount of a fee.").  "[T]he court's intrusion upon what is otherwise a private consensual agreement ... must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."  *Officers for Just.*, 688 F.2d at 625.  Where there is no evidence of collusion, courts accord substantial deference to fee and expense amounts determined by the parties.  *See Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001) (affording

27

"substantial weight to a negotiated fee amount"); *Cohn*, 375 F. Supp. 2d at 861 ("where ... the parties have agreed on the amount of attorneys' fees and expenses, courts give the parties' agreement substantial deference").

Here, the Court is not called upon to fashion a fee and expense award, but rather to evaluate the reasonableness and fairness of an agreed amount following arm's-length negotiations among sophisticated parties represented by competent counsel with the assistance of a neutral mediator. Houston Decl., ¶ 51. Unlike in class actions, where the diverging interests of class counsel and absent class members warrants judicial scrutiny of uncontested fee requests, here, counsel for AEP was directly involved and could assess the value of the Reforms. *Id.*, ¶¶ 52, 63; *In re Google Inc. S'holder Derivative Litig.*, No. 4:11-cv-04248-PJH, Transcript of Fairness Hearing (N.D. Cal. Jan. 21, 2015) at 11–12 (in evaluating fee awards negotiated in derivative actions, "the Court's responsibility is a little different than in your typical class action given the determination by the corporate entity that the amount is satisfactory")). Houston Decl. ¶ 63, Ex. N.

The negotiations were based on an informed analysis of the appropriate fee range in light of the Settlement benefits' value, contingency risk, and fees approved by courts in comparable cases. Houston Decl., ¶ 59, The fee negotiations also were facilitated and supervised by the Mediator, who was familiar with the complexity of the issues, risks, and challenges confronted by Plaintiffs, as well as the magnitude and quality of Plaintiffs' Counsel's efforts in securing the Settlement benefit. Houston Decl., ¶ 51. Following a number of exchanges, the Settling Parties agreed on the Fee and Expense Amount (subject to the Court's approval), in recognition of the substantial benefits conferred upon AEP and its stockholders by Plaintiffs' Counsel through the Settlement. Settlement, ¶13; Houston Decl., ¶ 58. The Mediator's role in the negotiations provides further assurances that the process was fair and the amount reasonable. *See In re AOL Time*

28

*Warner S'holder Derivative Litig.*, No. 02 Civ. 6302(CM), 2010 WL 363113, at *24 (S.D.N.Y. Feb. 1, 2010) ("[M]ediator's involvement in ... settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure") (omission in original).

Where the benefit to the company is non-pecuniary in nature, the payment of attorneys' fees is justified pursuant to the substantial benefit doctrine. *Shlensky v. Dorsey*, 574 F.2d 131, 149 (3rd Cir. 1978) ("The plaintiffs in a shareholders' derivative action may, thus, recover their expenses, including attorneys' fees, from the corporation on whose behalf their action is taken if the corporation derives a benefit, which may be monetary or nonmonetary, from their successful prosecution or settlement of the case."); *see also, e.g.*, *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 488 (D.N.J. 2012) ("corporate governance reforms, unaccompanied by monetary damages, may form the basis for an attorney's fee award where the reforms confer a 'substantial benefit' on the plaintiff corporation"); *Maher*, 714 F.2d at 461 ("effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment"); *Cohn*, 375 F. Supp. 2d at 853 (approving settlement of derivative action and finding that "[a]s a result of the implementation of the [s]ettlement's corporate governance changes, [the corporation] is far less likely to become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators and prosecutors").

Moreover, as courts in this district and the Sixth Circuit have recognized, "[t]he Court must ensure that [] counsel are fairly compensated for the amount of work done and the results achieved," as "[a]bsent adequate compensation, counsel will not be willing to undertake the risk" of representative litigation. *In re Nationwide Fin. Servs. Litig.*, No. 2:08-CV-00249, 2009 WL 8747486, at *12 (S.D. Ohio Aug. 19, 2009) (citing *Rawlings v. Prudential-Bache Props., Inc.*, 9

F.3d 513, 516 (6th Cir. 1993)). Indeed, "[a] litigant who creates a . . . 'substantial benefit' allocable with some exactitude to a definite group of persons may acquire an equitable claim against that group for the costs incurred in creating the ... benefit." *Smillie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir. 1983). The Court is required only to determine whether a fee award is "reasonable under the circumstances." *Rawlings*, 9 F.3d at 516 (citing *Smillie*, 710 F.2d at 275).

Applying these principles to derivative settlements, federal courts across the country have approved separately negotiated attorneys' fees provisions and have shown significant deference to corporate directors' business judgment with respect to the amount of attorneys' fees to be paid to plaintiffs' counsel where a substantial benefit has been conferred upon a corporation. *See In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568–70 (7th Cir. 1992) (market factors best understood by the negotiating parties should determine the quantum of attorneys' fees); *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir. 1974) ("we encourage counsel ... to utilize their best efforts to ... arrive at a settlement as to attorneys' fees"), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989); Houston Decl., Ex. O (*In re comScore S'holder Derivative Litig.*, No. 1:16-cv-09855-JGK, Excerpts from Final Approval Hearing Transcript (S.D.N.Y. June 7, 2018) at 20–21 (approving settlement and fees approved by disinterested directors)). The result of the Settling Parties' informed negotiations—reached with the assistance of the Mediator—is entitled to great weight in considering approval of the agreed-to Fee and Expense Amount.

**B.    Application of the Legal Standards Supports Approval of the Agreed Fee and Expense Amount**

In assessing the reasonableness of a fee award, courts in the Sixth Circuit apply the six factors identified in *Ramey v. Cincinnati Enquirer*, 508 F.2d 1188, 1196 (6th Cir. 1974). Those factors are: (i) the value of the benefits rendered; (ii) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (iii) whether the services were

undertaken on a contingent fee basis; (iv) the value of the services on an hourly basis; (v) the complexity of the litigation; and (vi) the professional skill and standing of all counsel. *Id.*[11] Here, application of the *Ramey* factors supports approval of the agreed-upon Fee and Expense Amount.

### 1. The Agreed Fee and Expense Amount Is Reasonable in Relation to the Value of the Settlement Benefit

The first *Ramey* factor requires the Court to evaluate the benefit of the settlement. "District courts in this Circuit widely regard the first Ramey factor as the most important." *Cardinal Health*, 528 F. Supp. 2d at 764. Corporate reforms specifically tailored to redress the alleged wrongful conduct that gave rise to the derivative claim provide substantial benefits to a corporation. *Johnson & Johnson*, 900 F. Supp. 2d at 488.

Under the substantial benefit doctrine, counsel who prosecute a stockholder derivative action that results in substantial benefits are entitled to fees and expenses in reasonable proportion to the value of the benefits, and taking into account contingency risks. *Mills*, 396 U.S. at 394-96 ("[A] corporation may receive a 'substantial benefit … justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature.… [P]rivate stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all shareholders[.]"). Courts recognize that a settlement providing for "a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have … caused extensive harm to the company … provide[s] considerable corporate benefits." *Pfizer*, 780 F. Supp. 2d at 342-43 (awarding $22 million fee). *See Ramey*, 508 F.2d at 1194 ("services performed by plaintiffs' attorneys justify an award of fees, even though no fund had been brought into court and even

---

[11] *See also In re Cardinal Health Inc. Sec. Litigations*, 528 F. Supp. 2d 752, 764 (S.D. Ohio 2007) ("There is no formula for weighing these factors. Rather, the Court should be mindful that each case presents a unique set of circumstances and arrives at a unique settlement, and thus different factors could predominate depending on the case.").

though it may be impossible to assign an exact monetary value to the benefit"); *In re Rambus Inc. Derivative Litig.*, No. C 06-3513 JF (HRL), 2009 WL 166689, at *3 (N.D. Cal. Jan. 20, 2009) ("Following *Mills*, courts consistently have approved attorneys' fees and expenses in shareholder actions where plaintiffs' efforts resulted in significant corporate governance reforms but no monetary relief"); *In re Oracle Sec. Litig.*, 852 F. Supp. 1437, 1445-50 (N.D. Cal. 1994) (changes in governance likely to produce economic benefits or cost avoidance are "'fund creating actions'" meriting fee and expense award) (quoting *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1164-65 (Del. 1989)); *see also In re Google Inc. S'holder Derivative Litig.*, No. CV-11-04248-PJH, 2015 WL 12990195, at *1-2 (N.D. Cal. Jan. 21, 2015) (awarding $9.9 million fee in settlement exclusively involving corporate governance enhancements); *Unite Nat'l*, 2005 WL 2877899, at *5 (awarding $9.2 million fee based on "the great benefit conferred upon [the company] as a result of the new corporate governance principles provided for in the settlement agreement").

Here, as discussed in sections III. and IV.B.2., *supra*, the Reforms—which will help to prevent a recurrence of similar alleged wrongdoing in the future, improve the Company's internal controls (including relating to the Company's oversight and operations concerning political engagement activity, public disclosures, and legal and regulatory compliance), and lay the foundation for enhancing investor confidence—confer substantial benefits with real economic value, which, even conservatively discounted, will exceed the agreed Fee and Expense Amount of $450,000 by at least an order of magnitude. The agreed upon Fee and Expense Amount is fair and reasonable in relation to the probable range of the value of the Reforms, and the complexity of the matter, the litigation risks, and the substantial time and expenses Plaintiffs' Counsel devoted to the case on a fully contingent basis.

Courts (including courts in the Sixth Circuit) routinely approve agreed-to fees in derivative litigation involving corporate governance enhancements like the Reforms secured here, which further evidences the reasonableness of the agreed-to Fee and Expense Amount in this case. *See, e.g.*, *In re CoreCivic, Inc. S'holder Derivative Litig.*, No. 3:16-cv-03040 (M.D. Tenn. Dec. 2, 2022) ($3.5 million fee for corporate therapeutics) (Houston Decl., Ex. P); *Sun v. Garipalli*, No. 3:21-cv-00311 (M.D. Tenn. July 16, 2024) ($2.5 million fee for corporate therapeutics) (Houston Decl., Ex. Q); *In re Alphatec Holdings, Inc. Derivative S'holder Litig.*, No. 37-2010-58586-CU-BT-NC, slip op. (Cal. Super. Ct.-San Diego Cnty. Aug. 18, 2014) ($5.25 million fee for corporate therapeutics) (Houston Decl., Ex. R); *In re F5 Networks, Inc. Derivative Litig.*, No. C06-794 RSL, 2011 WL 13195985, at *1 (W.D. Wash. Jan. 6, 2011) ($5 million fee in governance-only settlement); *In re Southern Company S'holder Derivative Litig.*, No. 1:17-cv-00725-MHC, slip op. (N.D. Ga. June 9, 2022) ($3.5 million fee for corporate therapeutics) (Houston Decl., Ex. S); *Cnty. of York Emps. Ret. Plan v. Jung*, Index No. 651304-2010, slip op. (N.Y. Sup. Ct., N.Y. Cnty. Aug. 1, 2016) ($4 million fee for corporate therapeutics) (Houston Decl., Ex. T); *In re MiMedx Group, Inc. S'holder Derivative Litig.*, No. 1:18-cv-04486-WMR, slip op. (N.D. Ga. Dec. 21, 2020) ($3.5 million for governance reforms) (Houston Decl., Ex. U); *Nixon-Crenshaw v. Coley*, No. 1:18-cv-25289-AHS, slip op. (S.D. Fla. Oct. 1, 2021) ($2.5 million fee for corporate therapeutics) (Houston Decl., Ex. V); *In re 3D Systems Corp. Derivative Litig.*, Lead Case No. 0:15-cv-03756-MGL, slip op. (D.S.C. Dec. 19, 2019) ($2.150 million for governance reforms) (Houston Decl, Ex. W).

Accordingly, the Fee and Expense Amount negotiated by AEP with the assistance of counsel and approved by the Board plainly falls within a reasonable range, and there is no basis to second-guess the Board's reasonable exercise of business judgment.

33

### 2.   The Contingent Nature of the Fee and Societal Benefit in Compensation Attorneys Who Produce Substantial Results

Courts routinely recognize that rewarding attorneys who prosecute actions on behalf of shareholders in class or derivative actions "is important because . . . most individuals would lack the resources to litigate cases, and individual recoveries are often too small to justify the burden and expense of such litigation." *Nationwide*, 2009 WL 8747486, at *14; *see also In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, No. 2:03-MD-1565, 2009 WL 1473975, at *4 (S.D. Ohio May 27, 2009) ("granting the fee request will serve society's interest in rewarding attorneys who produce such benefits in order to maintain an incentive to others").  Similarly, a fee award is warranted when counsel absorbed the risk of the litigation and proceeded with the representation on a wholly contingent basis.  *See Cardinal Health*, 528 F. Supp. 2d at 766 (the third *Ramey* factor "stands as a proxy for the risk that attorneys will not recover compensation for the work they put into a case.... Several courts consider the risk of non-recovery the most important factor in the fee determination.").

Here, Plaintiffs' Counsel were able to achieve an excellent result for AEP and its stockholders.  Plaintiffs' Counsel's willingness to pursue this derivative litigation was a substantial and material cause of the Company's decision to adopt, implement, and maintain the Reforms. Houston Declaration, ¶ 67.  In addition to pursuing claims on behalf and for the benefit of AEP and its stockholders, Plaintiffs' Counsel undertook this formidable task on a wholly contingent basis.  *Id*.  Plaintiffs' Counsel vigorously represented Plaintiffs' interests, despite substantial obstacles, on behalf of the Company and its stockholders.  *See Monday v. Meyer*, No. 1:10 CV 1838, 2011 WL 5974664, at *4 (N.D. Ohio, Nov. 29, 2011).  Plaintiffs' Counsel achieved a substantial result while bearing all risk of success or failure. Thus, the second and third *Ramey* factors support approval of the agreed Fee and Expense Amount.

### 3. The Value of the Services on an Hourly Basis

Plaintiffs' Counsel, all of whom are experienced and skilled in stockholder litigation (*see, e.g.*, Houston Decl., Exs. B-H), committed significant time and money to the Derivative Actions, including a collective lodestar of $1,481,796.75 representing 1,937.45 hours and $14,285.62 in expenses. Houston Decl., ¶¶ 78, 82. Counsel expended significant time, fees, and costs associated with, *inter alia*, investigating and prosecuting the Derivative Actions, which included substantial legal and factual research (including in connection with a pre-suit inspection demand and review of internal AEP books and records), briefing and argument on the Defendants' motion to dismiss, work in connection with the appeal, and mediation and settlement efforts. *Id.*, ¶ 69. Nonetheless, when considering a fee and expense award paid to plaintiffs' counsel in stockholder derivative actions, courts should look beyond a simple lodestar calculation in making a fee award. *Cohn*, 375 F. Supp. 2d at 862 (citing *Blum v. Stenson*, 465 U.S. 886 (1984)).

Further, it is common in complex cases such as the Derivative Actions for courts in this Circuit and throughout the country to award multipliers on counsel's lodestar. *See, e.g.*, *Karpik v. Huntington Bancshares Inc.*, No. 17-CV-1153, 2021 WL 757123, at *8-10 (S.D. Ohio Feb. 18, 2021) (approving 3.3 lodestar multiplier); *Cardinal Health*, 528 F. Supp. 2d at 767 (approving 5.9 multiplier); *Arp v. Hohla & Wyss Enters., LLC*, No. 3:18-CV-119, 2020 WL 6498956, at *7 (S.D. Ohio Nov. 5, 2020) (approving 5.29 multiplier). Here, however, Plaintiffs' Counsel actually have a "negative" (or "fractional") multiplier of 3.2. Houston Decl., ¶ 78. A "multiplier of less than one, (sometimes called a negative multiplier) suggests that the negotiated fee award is a reasonable and fair valuation of the services rendered [] by [] counsel." *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 854 (N.D. Cal. 2010); *see also In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 259, 271 (S.D.N.Y. 2012) ("[T]he lodestar cross-check results in a negative multiplier of less than 0.92—a strong indication of the reasonableness of the proposed

fee."); *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013 (LAK), 2007 WL 1294377, at *8 (S.D.N.Y. May 2, 2007) (negative multiplier "is reasonable because it will not bring a windfall to co-lead plaintiffs' counsel"); *Jermyn v. Best Buy Stores, L.P.*, No. 08 Civ. 214 (CM), 2012 WL 2505644, at *9 (S.D.N.Y. June 27, 2012) ("negative" lodestar multiple indicates reasonableness of fee); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *20 (S.D.N.Y. Dec. 23, 2009) (fee request constituting "deep discount" from lodestar "unquestionably" supports the award); *In re Veeco Instruments Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115809, at *4 (S.D.N.Y. Nov. 7, 2007) (same).

### 4. The Complexity of the Litigation

Stockholder derivative litigation is notoriously complex, which further supports the agreed-upon Fee and Expense Amount, given that the claims involved "complex questions of law and fact, including the fiduciary duties owed by [AEP's] directors to their shareholders." *Nationwide*, 2009 WL 8747486, at *15. As is detailed in the Settlement and the Houston Declaration, Plaintiffs' Counsel spent substantial time through, among other things, investigating their respective claims prior to and following the filing of the Derivative Actions, respectively. The complexity of the Derivative Actions thus favors final approval of the Fee and Expense Amount.

### 5. The Professional Skill and Standing of All Counsel

The litigation included the participation of highly skilled and specialized attorneys for the Settling Parties. *See* Houston Decl., ¶ 66 & Exs. B-H. As the *Nationwide* court recognized, "highly experienced" Plaintiffs' counsel, "faced with formidable opposition [including] very skilled and experienced counsel in securities and transaction litigation, who could draw upon the exceptional resources of their nationally recognized law firm[] ... [are] factor[s] that may be

considered when evaluating a fee request." *Nationwide*, 2009 WL 8747486, at *7, *15. Thus, this factor supports the Fee and Expense Amount.

## VI.     THE MODEST SERVICE AWARDS SHOULD BE APPROVED

The Settlement proposes the payment of service awards to Plaintiffs in the amount of $2,500 each which will be paid out of the Fee and Expense Amount. Settlement, ¶15. "An incentive payment to come from the attorneys' fees awarded to plaintiff's counsel need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected." *In re Cendant Corp., Derivative Litig*,. 232 F. Supp. 2d 327, 344 (D.N.J. 2002). Likewise, the payment of service awards in the Derivative Actions, to be paid to each of the Plaintiffs in the Derivative Actions out of the Fee and Expense Amount, is justified in recognition of Plaintiffs' efforts in pursuing and successfully resolving the Derivative Actions. *See* Houston Decl., Exs. B-H.

## VII.    CONCLUSION

Plaintiffs respectfully request this Court grant final approval of the Settlement and approve the Attorney's Fee and Expense Amount and service awards.

Dated: September 12. 2024        Respectfully submitted,

*/s/ John C. Camillus*

**LAW OFFICES OF JOHN C. CAMILLUS LLC**
John C. Camillus (0077435)
P.O. Box 141410
Columbus, OH 43214
Telephone: (614) 992-1000
E-mail: jcamillus@camilluslaw.com

*Liaison Counsel for Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
Matthew M. Houston
745 Fifth Avenue, Fifth Floor
New York, New York 101519
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com

**ROBBINS LLP**
Brian J. Robbins
Craig W. Smith
Shane P. Sanders
5060 Shoreham Place, Suite 300
San Diego, California 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail:brobbins@robbinsllp.com
      csmith@robbinsllp.com
      ssanders@robbinsllp.com

*Co-Lead Counsel for Plaintiffs*